City of Watseka, Appellee, v. Simon Blatt, Appellant.

Gen. No. 9,879.

192

Opinion filed July 8, 1943. Rehearing denied September 21, 1943.

SHAPIRO & LAURIDSEN, for appellant.

DAVID E. ORAM, of Watseka, for appellee.

MR. JUSTICE DOVE delivered the opinion of the court.

On a trial before a justice of the peace, under a complaint charging appellant with violating a zoning ordinance of the City of Watseka, ''by unlawfully extending and operating a junk yard on premises within the business district'' of the city, he was found guilty and fined $25 and costs. On appeal to the circuit court of Iroquois county there was a like result, after a trial by the court without a jury. On his appeal to the Supreme Court the cause was transferred to this court because there was no certificate of the trial judge that the public interests required a direct appeal to the Supreme Court, as required by section 75 of the Civil

Practice Act (Ill. Rev. Stat. 1941, ch. 110, par. 199 [Jones Ill. Stats. Ann. 104.075]), and because the statement of errors relied upon for reversal did not specifically or sufficiently present any constitutional question so as to give the Supreme Court jurisdiction of a direct appeal. *City of Watseka v. Blatt*, 381 Ill. 276.

Sections 9 and 10 of the zoning ordinance in controversy provide:

"Section 9. Junk yards.—No junk yard shall be established or operated in the City of Watseka, Illinois, except in an Industrial District, and shall not be established or operated in an Industrial District unless consent is obtained in writing of seventy-five per cent of the property owners within a radius of Five Hundred (500) feet of the location of said proposed junk yard, and subject to the specific approval of the Board of Zoning Appeals 'both as to location and as to arrangement.

"Section 10. Definition of junk yard.—A junk yard shall be defined as a plot of ground, which may be covered with buildings; partly covered with buildings, or without any buildings, which plot is used for the buying, selling, storing, and trading of old iron, rags, hides, furs, old furniture, rubber, wool, used cars, used car parts, old metals, bottles and the like commonly called junk."

The ordinance became effective on August 6, 1939. The facts hereinafter recited appear by stipulation of the parties: Walnut street runs east and west, crossing the C. and E. I. railroad at a right angle. A short distance west of the railroad the street turns to the northwest. At and prior to the passage of the zoning ordinance, appellant conducted a junk yard and a used auto parts business on a lot designated in the record as Lot A. This lot is located on West Walnut street, the southeast corner of which was 97 feet northwest of the point where Walnut street turns to the north-

west. It has 100 feet frontage on Walnut street. After the passage of the zoning ordinance, he purchased two other lots on the north side of the street which will be called Lots B and C. Lot B adjoins the easterly line of Lot A, with a frontage on Walnut street of 51 feet and its lines roughly parallel the lines of Lot A. Lot C is about triangular in shape, with the apex to the north; its west line adjoins Lot B and its southerly line extends along the north side of Walnut street for a frontage of 96 feet. By the terms of the zoning ordinance the westerly line of Lot A is the boundary line between two zones; the land east of the line being zoned as a business district, and the land west of the line being zoned as an industrial district. The main business section of the city is located on both sides of Walnut street, and extends east four blocks from the railroad.

Appellant purchased Lots B and C with full knowledge of the zoning ordinance and its provisions relating to the operating of junk yards and used auto parts business. Thereafter, contrary to the provisions of section 9, he extended his nonconforming use onto the newly purchased lots in the area known as a business district under the ordinance. It is not claimed that he violated the terms of the ordinance by conducting his business on Lot A, such nonconforming use being in existence when the ordinance was passed and being exempted by section 1 of the zoning statute (Ill. Rev. Stat. 1939, ch. 24, par. 66).

On the lot immediately east of Lot C there is a dwelling house. On the lot east of the dwelling there is a wholesale and retail poultry and produce business, and the next two lots east are improved by dwellings. All these premises are on the north side of Walnut street west of the railroad. Going west and starting from the railroad on the south side of Walnut street there are three dwellings, at the west one of which there is an unused oil station. On the lot next west

there is a State garage, used for storage, maintenance and repair of State automobiles and trucks used by the road district in which the city is located. Immediately west of the garage there is a restaurant and the lot next west is vacant. There is a dwelling on the next lot west, across the street from Lots B and C. Then comes Yount avenue which dead ends into Walnut street, and across Yount avenue on the south side of Walnut street is Yount Park extending west and northwest one block. At the rear of appellant's newly acquired property there is a dwelling on a lot which fronts north on Oak street. It is the only one of the properties mentioned which is in a residential zone. Appellant placed on the rear half of Lot B an eight foot wooden fence, painted white, and work done or goods placed behind the fence cannot be seen by a passerby or from the street in front of the premises. Prior to appellant's purchase of Lots B and C they were used for residential purposes.

It was further stipulated "that there is a relatively large area as set out by the said Zoning Ordinance in which the defendant could operate his junk yard and used auto parts business without violating any provision thereof, by complying with Section 9 of said Ordinance"; that either party might present any additional proper evidence, and that the term "newly acquired property" as used therein refers to Lot B.

The only testimony as to the stipulated extension of the nonconforming use is that appellant's business was expanding, and that since he bought Lots B and C, he has stored about 40 to 50 used cars and trucks on the rear end of Lot B, took used parts from some of them over to the junk yard on Lot A, dismantled or wrecked two old cars behind the fence, and sold eight or ten of the other cars to be used again. Nothing was stored on Lot C, and other than the activities mentioned, no business was conducted on Lot B or C. Witnesses for appellee testified there was an offensive

odor from the smoke of articles burned in the junk yard, but none of them testified there was any odor from Lots B or C, and appellant testified the only material burned was wood from old car bodies, which was burned only on Lot A. Appellee's witnesses mentioned seeing rats, but none of them testified the rats came from any part of appellant's premises, and one of them mentioned the nearby location of the poultry and produce business, and said there were rats before appellant acquired Lots B and C. From this testimony it does not appear that the business was conducted in such a way as to be a nuisance *per se*.

Appellant invokes the terms of section 95 of article 5 of the Cities and Villages Act (Ill. Rev. Stat. 1939, ch. 24, par. 65.94) as amended in 1935, and as in force when the zoning ordinance was passed and when the alleged violation of the ordinance took place, as being the governing statute. That section, as then in force, gave municipalities the power "to tax, license, regulate and direct the location of all places of business of purchasers, traders and dealers in junk, rags and any second hand article whatsoever." Appellant claims that it does not, by the term "regulate," authorize the city to prohibit the location of such places as junk yards. *People v. Busse,* 240 Ill. 338, and *Nahser v. City of Chicago,* 271 Ill. 288, relied upon by appellant, hold that the power to "regulate" does not include the power to "prohibit." The *Busse* case was decided in 1909 while the powers delegated by that section were only "To tax, license and regulate second hand and junk stores and yards." (J. & A. Anno. Stat., ch. 24, par. 1334(95) without any mention of power to direct location. That power was added in 1911. (L. 1911, p. 173; *Smolensky v. City of Chicago,* 282 Ill. 131, 1935.) The *Nahser* case, decided in 1915, held that under clause 41 of the same section, delegating power "to license, tax, regulate and prohibit . . . theatrical and other exhibitions, shows and amusements," the city had power to enact an ordinance prohibiting

a moving picture show within 200 feet of a Church. Neither of those cases support appellant's contention, and it is further to be noticed that they were decided prior to the enactment of the zoning law in 1921 (Ill. Rev. Stat. 1939, ch. 24, par. 66 *et seq.*), the pertinent portion of section 1 of which provides:

"In addition to existing powers . . . the city council in each city . . . shall have the following powers: . . . to classify, regulate and restrict the location of trades and industries and the location of buildings designed for specified industrial, business, residential and other uses; to divide the entire city . . . into districts of such number, shape, area and of such different classes (according to the use of the land and buildings) . . . as may be deemed best suited to carry out the purposes of this Act; . . . to prohibit uses, buildings and structures incompatible with the character of such districts respectively; . . . ."

The power to restrict locations and prohibit uses is thus expressly delegated by this section, and we find nothing in section 95, relied upon by appellant, that is incompatible with the provisions of the zoning statute.

*Brown v. Board of Appeals of Springfield,* 327 Ill. 644, decided after the passage of the Zoning Act is also relied upon by appellant. The opinion in that case cites the *Busse* case, *supra,* as to the interpretation of the word "regulate," but the point decided is that the provision in section 1 of the Zoning Act, authorizing cities "to regulate and limit the height and bulk of buildings," does not authorize the enactment of an ordinance requiring buildings thereafter constructed in a certain district to be at least 40 feet high, as the word "limit" means to restrict, and not to compel the erection of a building of a certain height. That case has no application here.

The power to prohibit the location or operation of a junk yard, or any other business, institution or building in a prescribed area is not an arbitrary power to

be exercised at the mere pleasure or whim of municipal authorities. The purpose of granting additional powers by the Zoning Act is by the terms of section 1 expressed to be "to the end that adequate light, pure air and safety from fire and other dangers may be secured, that the taxable value of land and buildings throughout the city, village or incorporated town may be conserved, that congestion in the public streets may be lessened or avoided, and that the public health, safety, comfort, morals and welfare may otherwise be promoted."

While it has been held that all uses of property or courses of conduct which are injurious to the health, comfort, safety, morals and welfare of society may be prohibited under the sovereign power of the State, though the exercise of such power result in inconvenience or loss to individuals, that power must find basis in the doctrine of overruling necessity or bear substantial relation to the public good and may not be based alone on aesthetic considerations. (*Forbes v. Hubbard,* 348 Ill. 166, and cases cited.) It is primarily the province of the municipal body to which the zoning function is committed, to draw the line of demarcation as to the use and purpose to which property shall be assigned or placed, and it is neither the province nor duty of courts to interfere with the discretion with which such bodies are vested, in the absence of a clear showing of an abuse of discretion, or when the question of whether the ordinance is unreasonable, arbitrary, or an unequal exercise of power is fairly debatable. (*Morgan v. City of Chicago,* 370 Ill. 347; *Thomas Cusack Co. v. City of Chicago,* 267 Ill. 344.) Ordinances duly enacted lie behind the bulwark of presumptive validity and the burden is upon the one assailing them to overcome that presumption. (*Rothschild v. Hussey,* 364 Ill. 557). But neither the study and investigation of zoning commissioners (stipulated in this case) nor the presumptive validity of the ordinance is the con-

trolling test whether the ordinance is a reasonable exercise of the police power. That matter is to be decided by the courts from all the facts and circumstances shown. While the opinions of experts or of laymen that a certain restriction which has found its way into an ordinance governing the use of property is in the interest of the public good, if fairly debatable, will not be disturbed by the courts, yet they are not final, but such restriction must face the test whether it is, in fact, in the interest of the public welfare. In thus considering that question each case is to be determined on its own facts and circumstances. (*State Bank & Trust Co. v. Village of Wilmette,* 358 Ill. 311; *Village of La Grange v. Leitch,* 377 Ill. 99.) If the means employed have no real, substantial relation to public objects within the power of the State, or if these means are arbitrary and unreasonable, courts will disregard mere forms and interfere for the protection of the rights injuriously affected by such illegal action. The owner of property has the right to make any use of it he desires, so long as he does not endanger or threaten the safety, health, comfort or general welfare of the people. (*Kennedy v. City of Evanston,* 348 Ill. 426, 428; *People v. Village of Oak Park,* 331 Ill. 406, 412; *People v. Norvell,* 368 Ill. 325, 327.) Nor does the fact that appellant purchased the property in controversy after the passage of the zoning ordinance estop him from attacking its validity. (*Forbes v. Hubbard,* 348 Ill. 166.)

A real estate agent testified that before the junk yard was located on Lot A, the property adjoining Lot C on the east could have been sold for $3,000, and that since then its value is $1,800. He testified that the extension of the junk yard onto the next lot would tend to further depreciate its value, but did not qualify his statement that it is still worth $1,800. The owner of the property fronting on Oak street north of appellant's premises testified he still gets the same rent for

his premises as he did before appellant bought Lots B and C. Under this testimony there is no convincing evidence in the record that the extension of the nonconforming use has or will depreciate the value of property in the vicinity. Nor is there any testimony that tends to show that the extension of the nonconforming use contravenes or conflicts with any of the other objects or purposes of the Zoning Act as expressed in section 1 thereof.

The requirement of section 9 of the zoning ordinance that the location or operation of a junk yard in an industrial district shall be subject to the specific approval of the board of zoning appeals delegates to that board a power which the Zoning Act expressly and exclusively commits to the city council. Where a power is expressly delegated to the city council, the power must be exercised by it as such a body, and cannot be exercised by any other body, or be delegated to others. (*City of Sullivan v. Cloe,* 277 Ill. 56; *City of Kinmundy v. Mahan,* 72 Ill. 462.) The requirement is further invalid because it specifies no terms or conditions for such approval, but leaves it to the caprice of the board of zoning appeals. (*People v. Norvell,* 368 Ill. 325.)

Although a requirement for frontage consents in residential districts has been generally sanctioned by the courts, it was held in *Koos v. Saunders,* 349 Ill. 442, that an ordinance requiring the written consent of a majority of the property owners, according to frontage, on both sides of the streets immediately surrounding the block, and of the owners of a majority of the property abutting on the street in question within 200 feet, before one could erect a gasoline filling station on his property, is unreasonable and oppressive where the lot on which the station was to be erected was in a district zoned for local business purposes and was surrounded by property devoted to business purposes,

even though two thirds of the improved property, according to frontage, on both sides of the streets surrounding the block, was used for residence purposes, as provided by the ordinance. In our opinion this holding is directly applicable here as to the requirement in section 9 of the ordinance for obtaining radial consents in an industrial district, and, considering the fact that Lots B and C, and all the dwellings in the vicinity, except one, are in a district zoned for business purposes, it cannot be said that the decisions in cases where the property was zoned for residence purposes have any application here. By reason of the increase of appellant's business necessitating additional room, he is directly affected by these provisions of the ordinance.

The stipulation as to the availability of other locations by complying with the provisions of the ordinance, does not validate such provisions or abridge appellant's rights to question their validity.

Furthermore, the definition of a junk yard in section 10 of the ordinance cannot be sustained. If, as contended by appellee, the word "and," as used therein, is to be interpreted as "or," it is obvious that dealing in either hides, furs, rubber, wool, used cars or used car parts, does not, without some other specification or qualification, constitute dealing in junk or make the place of any such business a junk yard. The ordinance does not comply with any accepted definition of the junk business. Webster's definition of "junk" is: "Old iron, or other metal, glass, paper, cordage, or other waste or discarded material which may be treated or prepared so as to be used again in some form." Dealing in used cars and used car parts carries with it the idea of their being used again for their original purpose, without reprocessing. Junk, as the term is ordinarily understood, means articles that have outlived their usefulness in their original form,

and are commonly gathered up and sold to be converted into another product, either of the same or a different kind by some manufacturing process.

In our opinion the above-mentioned provision of section 9 and the definition of a junk yard in section 10 of the ordinance are not in accord with the provisions delegated by the Zoning Act, and are so arbitrary and unreasonable as to render those sections void. We are further of the opinion that even if otherwise valid, the ordinance, as applied to appellant's newly acquired property, is clearly arbitrary and unreasonable, and therefore void as to such property. (*Village of La Grange v. Leitch,* 377 Ill. 99.)

The judgment of the circuit court is reversed and the cause is remanded with directions to find the defendant not guilty.

*Reversed and remanded with directions.*