ABRAHAM MAYER AND BARNEY MAYER AND THE OS-
BORNE & MARSELLIS CORPORATION, A NEW JERSEY
CORPORATION, PLAINTIFFS-RESPONDENTS, v. BOARD
OF ADJUSTMENT OF THE TOWN OF MONTCLAIR,
IN THE COUNTY OF ESSEX, DEFENDANT-APPELLANT.

Argued February 22, 1960—Decided April 4, 1960.

Mr. *Samuel Allcorn, Jr.* argued the cause for the defendant-appellant.

Mr. *Samuel Rosenblatt* argued the cause for the plaintiffs-respondents (Mr. *Samuel Rosenblatt,* attorney for plaintiffs-respondents Abraham Mayer and Barney Mayer; Mr. *Nicholas H. Hagoort, Jr.,* of counsel. Messrs. *Porter and Hobart,* attorneys for plaintiff-respondent The Osborne & Marsellis Corporation; Mr. *Newton H. Porter, Jr.,* of counsel).

The opinion of the court was delivered by

BURLING, J. This case arises out of the Montclair Board of Adjustment's denial of plaintiffs Mayers' application for a zoning variance under *N. J. S. A.* 40:55–39(*d*). Mayers are purchasers from plaintiff Osborne & Marsellis Corporation under a contract of sale concerning the land in question, which contract, however, is conditioned for performance upon the Mayers' obtaining permission to conduct upon the land a business similar to that presently carried on by them on a nearby lot. The business involves the purchase of old cars, some of which are resold in the condition purchased, others of which are demolished, their usable parts salvaged and sold, and the remainder cut into scrap and sold in that form. In a portion of its findings not appealed from, the board of adjustment described the proposed use in the following language:

"That according to testimony given by the applicants, the nature of the use which they desire to conduct on the premises in question has its origin in the purchase by them of approximately 700 used, wrecked or unsalable autos annually; that some of the used cars are resold as is to private purchasers; that the unsold portion of such unsalable used cars along with the wrecks and the unusable cars are reduced to scrap, segregated into different classes of metals and non-metallic materials and held for sale at prevailing published scrap prices to various established tonnage dealers in these scrap commodities; that in such reduction certain used but usable parts such as rear ends, transmissions, radiators, generators, motors, aluminum crank cases, starting motors, wheels, tires, etc. are salvaged and set aside, as is, for resale, piece by piece, to individual private purchasers for use as parts replacement, particularly on old model or obsolete cars; that the ferrous, metal scrap, such as frames and bodies, a considerable tonnage for which there is a minimum or no individual buyer demand, is reduced to handling or charging box size by oxy-acetylene cutting; that applicants testified that a sizeable number of truck loads of such scrap are taken away every three months by dealers in steel scrap, cast iron scrap, brass, aluminum, copper and lead; that scrap tires and rubber are removed monthly. That though the storage and subsequent sale of some of the used automobiles and some of the used parts, piece by piece, to private individuals for their own particular use, is an appreciable part of the business from a gross dollar volume standpoint, nevertheless the used car and used replacement part of the business is incidental to the primary and continuing function of the

enterprise, viz.: the reduction of used, wrecked or unusable cars into ferrous, non-ferrous and non-metallic scrap for subsequent sale at prevailing prices to various established tonnage dealers in these commodities; that nonusable non-metallic materials such as upholstery, cushions etc. are accumulated and burned by open fires on the premises; that though the applicants testified that they did not use oxy-acetylene torches to cut metallic scrap, nor burn nonsalable or metal materials on windy days, because of the inherent danger, nevertheless, that in order to prevent undue accumulation of such materials and because of the very nature of the business, the burning of this nonsalable materials must be a continuous operation regardless of climatic conditions."

From the board of adjustment's denial of the application for a variance under *N. J. S. A.* 40:55–39(*d*), the Mayers appealed to the Superior Court, Law Division, filing a complaint in lieu of prerogative writs, in which the Osborne & Marsellis Corporation joined as plaintiff. That court reversed the board's determination and ordered the board to grant the requested variance on the condition that plaintiffs did not engage in the burning described above. An appeal was prosecuted to the Superior Court, Appellate Division, which court held that the board's denial was improper but for different reasons than expressed by the trial court. In addition, the Superior Court, Appellate Division, recognizing that the ultimate decision concerning a requested variance under *N. J. S. A.* 40:55–39(*d*) rests with the local governing body, limited its mandate to require the board to recommend approval of Mayers' application pursuant to *N. J. S. A.* 40:55–39(*d*). *56 N. J. Super. 296 (App. Div. 1959).* We granted certification. *30 N. J. 601 (1959).*

The present owner of the land in question, the Osborne & Marsellis Corporation, rents two buildings located on the land to a construction company and uses the remainder of the property as a lumber yard. In the past, the land has been utilized as a storage place for coal, fuel oil, and miscellaneous building supplies. The town refers to all of these as seemingly nonconforming uses. The property has been for sale for nearly three years, but the plaintiffs' offer was the first one acceptable to the present owner.

The evidence reveals that the land in question, located in Montclair, is an irregular tract consisting of slightly over two acres. Its southern boundary is formed by Bloomfield Avenue, an east-west traffic artery which, at its line of contact with the land in question, rises on a viaduct so that the street level is nearly forty feet above the abutting land. On the west of the property are railroad tracks. North of the railroad tracks and on the west side of the property is Bay Street. The property abuts on Bay Street only a short distance, but this portion of the property constitutes the sole means of access to a public road. On the northern boundary of the property in question there is land on which is located a frame dwelling house and the facilities of a heating and airconditioning contractor's business. The eastern boundary of the property, at the point closest to the land abutting on the north and proceeding southward over half the distance to Bloomfield Avenue, consists of Toney's Brook, a small creek maintained as part of Montclair's drainage system. At that point, the eastern boundary crosses Toney's Brook and thence continues southwardly to Bloomfield Avenue.

Except for that portion within 100 feet of Bloomfield Avenue, which portion is part of a C–1 (commercial) zone of the zoning ordinance, the property in question is located in an M–1 (light industrial) zone of the ordinance. Concerning M–1 zones, the applicable zoning ordinance states:

"In M–1 Zones, no building or premises shall be used for any of the following specified trades, industries or uses.
\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*
(44) Any open land use such as yards for the storage of material of any kind, junk yard or the like."

Concerning C–1 Zones, the ordinance provides:

"In a C-1 Zone no building or premises shall be used in whole or in part for any of the following specified trades, industries or uses
(a) Any uses excluded from M-1 Zones
\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(e) Carting, express, hauling or storage yard.

\* \* \* \* \* \* \* \*

(1) Storage or baling of scrap, paper, rags, old iron or junk."

All the land in the immediate vicinity of the property in question and on the same side of Bloomfield Avenue is located in the M–1 zone, except for a 100 foot wide commercially zoned (C–1) strip running along the north side of Bloomfield Avenue. Properties contiguous to Bloomfield Avenue on its southerly side are strip zoned for commercial use.

Many of the properties adjacent to the land in question, which are located in the light industrial zone, are used as dwellings. A lesser number have combined dwelling and other type of uses. Others are engaged only in a commercial or industrial use. Immediately to the west of the property in question, between the railroad tracks and the intersection of Bloomfield Avenue and Bay Street, there is located a coal storage yard. Some of the properties to the north and east are used by contractors for open air storage of materials and vehicles. To the east stands a fire-gutted building recently used for the making of parts for venetian blinds. Across Bloomfield Avenue and further to the east there is property on which Mayers presently carry on their business, apparently as a nonconforming use. In fact, the above description suggests that much of the land in the vicinity of the property in question is employed in nonconforming uses, *e. g.,* the coal storage yard, and the contractors' open air storage.

The first question to be decided is whether the Montclair zoning ordinance, applicable in this case, prohibits the Mayers' proposed use, the automobile salvage business hereinbefore described in detail, on the portion of the property zoned M–1. Both the board of adjustment and the trial court apparently concluded that the proposed use was proscribed by the local zoning ordinance, but the Superior Court, Appellate Division, held to the contrary. Specifically

the question is whether the proposed use constitutes a "junk yard."

The Superior Court, Appellate Division [56 *N. J. Super.* 296], held that by "junk yard" is meant "the classic junk yard," and, as to Mayers' business, that "theirs is a specialty field, not the junk yard business, as it is commonly known. See *Eastern Scrap & Salvage Corp. v. Burns, 5 N. J. Super.* 616 (*Law Div.* 1949); *Grace Iron & Steel Corp. v. Ackerman*, 123 *N. J. L.* 54 (*Sup. Ct.* 1939)." What is meant by "classic junk yard" was not made clear, but the *Grace Iron & Steel Corp.* case, *supra*, 123 *N. J. L.*, at *page 57*, stated that "junk" is commonly said to be "old iron, glass, paper, cordage, or other waste which may be treated so as to be used again in some form; also, any old or discarded material, as metal, paper, rags, *etc.*, and, in general, anything that is regarded as merely worthless or merely trash." According to plaintiffs' contention, a junk yard is a place where all or most of the specific matter named above may be found, and that the term in dispute does not include an automobile salvage yard.

We cannot agree with the plaintiffs' contention, however, and we hold that the contemplated use is proscribed by the terms of the applicable zoning ordinance prohibiting "junk yards" in M–1 zones. The term "junk yard" has often been applied to places devoted to the storage and commercial use of one type of waste material, in fact, to uses identical to that in question. In *Town of Hobart v. Collier, 3 Wis. 2d* 182, 87 *N. W. 2d* 868, 870 (*Sup. Ct.* 1958) the court speaks of an "automobile salvage or junk yard" and of "junked automobiles" being burned and broken into parts. In *Parkersburg Builders Material Co. v. Barrack*, 118 *W. Va.* 608, 191 *S. E.* 368, 371, 192 *S. E.* 291, 110 *A. L. R.* 1454 (*Sup. Ct.* 1937) the court described an "automobile junk yard" as part of the business of "buying old automobiles, wrecking them and selling serviceable parts as such and junking the residue * * *." *Miller v. Zoning Bd. of Appeals*, 138 *Conn.* 610, 87 *A. 2d* 808 (*Sup. Ct. Err.* 1952)

and *Delmar v. Planning and Zoning Bd.*, 19 *Conn. Sup.* 21, 109 *A. 2d* 604 (*C. P.* 1954) use the term "motor vehicle junk yard." And it is not a valid argument that the zoning ordinance under consideration fails to prohibit the contemplated use because it does not specifically mention automobile or motor vehicle junk yards. In *People v. Hein,* 187 *Misc.* 6, 65 *N. Y. S. 2d* 318 (*Police Ct.* 1945) an automobile junk yard is referred to as a junk yard. In *Bassett, Zoning,* 114–115 (1940), the premises of an automobile dismantling business is denominated an "automobile junk yard" and the tenant thereof as a "junk-yard tenant." In 2 *Metzenbaum, Law of Zoning,* 1600–1610 (1955), automobile junk yard cases are considered under the general heading of junk yards. In 2 *Yokley, Zoning Law and Practice,* § 234, *p.* 127 (*2d ed.* 1953), it is said:

"'Junk,' as the term is ordinarily understood, means articles that have outlived their usefulness in their original form, and are commonly gathered up and sold to be converted into another product, either of the same or a different kind by some manufacturing process."

Since a junk yard may be said to be a place where such activities are carried on, the proposed use constitutes a specific type of junk yard within the meaning of the latter term and is, therefore, prohibited by the ordinance in question.

*Grace Iron & Steel Corp. v. Ackerman,* 123 *N. J. L.* 54 (*Sup. Ct.* 1939), cited by plaintiffs, is not to the contrary. The use involved in that case was considerably different from that in question here. In that case it was said:

"The proofs disclose that prosecutor is engaged in the business of vending scrap iron, steel, and metal. It has places of business in this country and in Europe. It has used the *locus* merely as a shipping station, and sought the certificate of occupancy as a warrant for continuing that use. It is designed to employ the premises for the storage of these commodities only as an incident to this primary use. The material is to be placed on boats and barges moored in the adjoining river for transportation to the Newark Bay, and thence

to distant ports. It is not intended to devote the premises, nor has such use been made of them, to the cutting, sorting, treatment, or processing of the scrap metal. Only select steel scrap, classified as Grade No. 1 and Grade No. 2, 'heavy melting steel scrap cut to mill size by the original sources,' is to be shipped from this depot. The pieces of scrap so graded do not exceed five feet in length. Those comprised in Grade No. 1 'must not exceed eighteen inches' in width, and 'be at least a quarter of an inch * * * in thickness,' while the pieces falling into Grade No. 2 'must be over eighteen inches wide, and may run from ⅛ of an inch * * * to a quarter of an inch in thickness.' There is no equipment upon the premises except an electro-magnet crane used for the lifting of the metal pieces to the moored vessel.

The lands are not to be used for the purchase or sale of such materials. These transactions are to be carried on elsewhere; and the deliveries to prosecutor's premises will ordinarily be made by the dealers in their own vehicles. Normally, the material thus delivered will be loaded on the vessel directly from the dealer's truck. On the occasions when that course is not feasible, the delivered merchandise will be stored not 'more than the length of time it takes * * * to load a scow, probably not more than 3 to 5 days at the most.' Such has been the practice in the past." 123 *N. J. L.*, at *pages* 56–57.

Thus the difference in kind between the uses involved in that case and in the instant litigation is readily apparent.

In *Eastern Scrap & Salvage Corp. v. Burns*, 5 *N. J. Super.* 616 (*Law Div.* 1949), cited by plaintiffs, the question to be decided involved different considerations from those applicable in this case. In that case, the question was whether the business there considered, similar to that involved here, required a junk dealer's license and a fee of $200, or a general business license and a fee of $800. The court there decided that the licensee's business fell without the class of business intended to be licensed as junk yards. In that case, as in *City of New York v. Vandewater*, 113 *App. Div.* 456, 99 *N. Y. S.* 306 (1906); *City of Chicago v. Iroquois Steel & Iron Co.*, 284 *Ill. App.* 561, 1 *N. E. 2d* 241 (*App. Ct.* 1936); and *City of Duluth v. Bloom*, 55 *Minn.* 97, 56 *N. W.* 580, 21 *L. R. A.* 689 (*Sup. Ct.* 1893), also cited by plaintiffs, it is the peculiar purpose of the ordinances involved which leads to definitions of the term "junk yard" different from that which we reach with re-

gard to the zoning ordinances involved in the instant litigation, and hence those cases are distinguishable. The proposed use is precluded in C–1 zone and there is no denial thereof.

The next question to be decided is whether the board of adjustment erred in denying Mayers' application for a variance under *N. J. S. A.* 40:55–39(*d*). The board of adjustment decided that Mayers failed to demonstrate special reasons to support their use variance request and that the variance "would result in substantial detriment to the public good, and could not be done without substantially impairing the intent and purposes of the zone plan and the Zoning Ordinance of the Town of Montclair." The trial court held that the evidence before the board established that special reasons existed for granting the requested recommendation for a variance and that the variance, if granted, "would not be detrimental to health, public safety and general welfare of the community, nor of adverse effect to property values in the area, or impair public morals, and that to grant the desired variance will not substantially violate the intent and purpose of the zoning plan, ordinance or statute." The Superior Court, Appellate Division, in addition to its holding, relating to the scope of the ordinance, heretofore discussed, that a variance as to the property located in the M–1 zone would not be necessary, held that the Mayers' application should have been granted by the board in respect to the property located in the C–1 Zone.

In *Andrews v. Board of Adjustment*, 30 *N. J.* 245, 249 (1959), this court, in discussing the requirements imposed by *N. J. S. A.* 40:55–39(*d*), stated:

"Two critical findings are required by the statute: (1) that the variance 'can be granted without substantial detriment to the public good and will not substantially impair the intent and plan of the zone plan and zoning ordinance'; (2) that 'special reasons' exist for the variance."

In this case, in order to disturb the ultimate result reached by the board of adjustment in denying the application, its

decision on both of these critical findings must be over-turned as unreasonable, arbitrary and capricious. *Russell v. Board of Adjustment,* 31 *N. J.* 58, 69–70 (1959); *Andrews v. Board of Adjustment,* 30 *N. J.* 245, 251 (1959). If, however, it is found that the record developed before the board is sufficient to sustain either finding of the board, the board's decision will be upheld. Thus if the board's decision that Mayers failed to show adequate special reasons to allow the requested use variance is sustained, it is sufficient to dispose of this phase of this appeal.

 It has been stated that "no definition of 'special reasons' has been attempted beyond the reference to *R. S.* 40:55–32. In the nature of the subject, a precise formula is not feasible. Each case must turn upon its own circumstances." *Andrews v. Board of Adjustment, supra,* 30 *N. J.,* at *page* 251. In the instant case, it is significant that no proof has been adduced to demonstrate that the land in question is unsuitable for the presently allowable use as premises for light industry. Also, the presence of numerous conforming uses, the location of the nonconforming uses and their nature and the nature of the proposed use suggest that the business to which the land in question is proposed to be put would be inconsistent with the character of the neighborhood, which is an important element in any case in determining whether special reasons exist and whether there is a detriment to the public good. *Grimley v. Village of Ridgewood,* 45 *N. J. Super.* 574, 582 (*App. Div.* 1957), certification denied 25 *N. J.* 102 (1957). The evidence in this case demonstrates that the required special reasons for permitting the variance under *N. J. S. A.* 40:55–39(*d*) do not exist. We hold that the finding of the board of adjustment that the Mayers failed to show special reasons to allow their request for a variance under *N. J. S. A.* 40:55–39(*d*) is not unreasonable, arbitrary, or capricious, and, therefore, will be sustained.

Thus we conclude that the applicable zoning ordinance precludes the use to which the Mayers intend to put the

land in question, and, further, we hold that the board of adjustment's decision denying Mayers' application for a variance was warranted.

The judgment of the Superior Court, Appellate Division, is reversed and the decision of the board of adjustment is ordered reinstated.

*For reversal*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—7.

*For affirmance*—None.