THE COUNTY OF LAKE, Plaintiff and Counterdefendant-Appellant, v. NORMAN ZENKO, Defendant and Counterplaintiff-Appellee.

Second District   No. 2—87—0841

Opinion filed August 30, 1988.

Fred L. Foreman, State's Attorney, of Waukegan (Joseph E. Kolar, Assistant State's Attorney, of counsel), for appellant.

Berle L. Schwartz and Andi C. Goldfine, both of Highland Park, for appellee.

JUSTICE UNVERZAGT delivered the opinion of the court:

Plaintiff, the County of Lake (County), appeals from a directed finding entered in the circuit court of Lake County for defendant-counterplaintiff, Norman Zenko. The County filed an amended complaint against Zenko seeking, *inter alia*, to enjoin his operation of a junkyard in violation of the Lake County zoning ordinance. Zenko answered, asserted affirmative defenses, and countercomplained for a declaratory judgment that, *inter alia*, the zoning of the premises as light industrial (LI) was invalid, the restrictions on junkyards in areas zoned LI and the area limitation for a junkyard use in intensive industrial (II) zones was arbitrary and capricious, and the definition of "junk yard" in the ordinance was not authorized by the zoning enabling act and was so arbitrary and unreasonable as to render the definition void.

Upon motion by Zenko for a directed verdict at the close of the plaintiff's evidence, the court found Zenko's activities constituted a junkyard use as defined in the ordinance, determined the definition of junkyard as applied to Zenko was not authorized by law, and was arbitrary, unreasonable, discriminatory and confiscatory. The court also determined the use and area limitations in the Lake County zoning ordinance for junkyards are not applicable to Zenko's property and present activities and that the present zoning of the property insofar as it prevents the use of the premises for Zenko's present operations is discriminatory, arbitrary, capricious and is an unconstitutional exercise of the police power delegated to the plaintiff. The court's order specified there was no just reason for delaying enforcement or appeal. (107 Ill. 2d R. 304(a).) We reverse.

■ Although the County provides a statement of the procedural history of the case, its "Statement of Facts" makes no reference to the evidence received at trial, nor does the argument portion of its brief relate its citations of authority to the evidence received at trial, all in violation of Supreme Court Rule 341 (107 Ill. 2d Rules 341(e)(6), (e)(7)). In spite of these deficiencies, we proceed to consider the merits of the issue which, as narrowly circumscribed by the County, presents a question of law; that is, whether the definition of

"junk yard" in article 2 of the Lake County zoning ordinance is unreasonable and, therefore, invalid.

Article 2 of the Lake County zoning ordinance defines "Junk Yard" as:

"Any land or *structure* used for a salvaging operation, including, among other things, the storage and sale of waste paper, rags, scrap metal, and discarded materials, and the collecting, dismantling, storage, and salvaging of unlicensed, inoperative vehicles." (Emphasis in original denoting that term is also defined in the ordinance.) Lake County, Ill., Zoning Ordinance art. II (May 12, 1987).

The court's order specifically found that "[t]he activities of Defendant Counter-Plaintiff consists [*sic*] of the purchase and dismantling of used cars, the housed storage and sale of useable mechanical parts thereof, and the external storage and sale of the body parts thereof, and the hauling and sale to Rondout Iron & Metal of the non-saleable [*sic*] parts thereof." An average of 230 vehicles were on defendant's lot on any given day. Although the court found defendant's activities did constitute a junkyard use as defined, it found the definition as applied to the defendant's activities was not authorized by law, and was arbitrary, unreasonable, discriminatory and confiscatory. It found *City of Watseka v. Blatt* (1943), 320 Ill. App. 191, dispositive.

In *Watseka*, the property owner appealed a guilty verdict entered against him on a complaint charging him with violating a city zoning ordinance " 'by unlawfully extending and operating a junk yard on premises within the business district' of the city." (*Watseka*, 320 Ill. App. at 192.) The property owner operated a legal nonconforming use of a junkyard and a used auto parts business on Lot A. After the effective date of the ordinance prohibiting the establishment or operation of a junkyard except in an industrial district, the property owner purchased Lots B and C and extended his nonconforming use onto the newly purchased lots in an area designated a business district.

The property owner contended the relevant zoning enabling act, section 95 of article 5 of the Cities and Villages Act (Ill. Rev. Stat. 1939, ch. 24, par. 65.94), did not include by the power to "regulate" the location of junk dealers, the power to "prohibit" such locations. The court disagreed, noting that the enabling act expressly delegated the power to restrict locations and prohibit uses. Based on the evidence concerning the property owner's use of the premises, however, the court found that, as applied to him, the ordinance prohibiting his

extension of the nonconforming use was so arbitrary and unreasonable as to be void where the use neither contravened nor conflicted with any of the other objects or purposes of section 1 of the zoning enabling act. Those expressed objects or purposes were " 'to the end that adequate light, pure air and safety from fire and other dangers may be secured, that the taxable value of land and buildings throughout the city, village or incorporated town may be conserved, that congestion in the public streets may be lessened or avoided, and that the public health, safety, comfort, morals and welfare may otherwise be promoted.' " *Watseka*, 320 Ill. App. at 198.

Of significance here, the court also found the definition of junkyard was not in accordance with the provisions of the zoning enabling act and was so arbitrary and unreasonable as to render that section void. The term "junk yard" was defined there as:

" '[A] plot of ground, which may be covered with buildings; partly covered with buildings, or without any buildings, which plot is used for the buying, selling, storing, and trading of old iron, rags, hides, furs, old furniture, rubber, wool, used cars, used car parts, old metals, bottles and the like commonly called junk.' " *Watseka*, 320 Ill. App. at 193.

For reasons unclear to us, the city of Watseka as appellee argued that the word "and" in the concluding phrase of the definition should be construed as a disjunctive conjunction, *i.e.*, "*or* the like commonly called junk," thus effectively separating the definition's qualifying language from the items specifically enumerated therein. As a result, the *Watseka* court concluded:

"If, as contended by appellee, the word 'and,' as used therein, is to be interpreted as 'or,' it is obvious that dealing in either hides, furs, rubber, wool, used cars or used car parts, does not, without some other specification or qualification, constitute dealing in junk or make the place of any such business a junk yard. The ordinance does not comply with any accepted definition of the junk business. Webster's definition of 'junk' is: 'Old iron, or other metal, glass, paper, cordage, or other waste or discarded material which may be treated or prepared so as to be used again in some form.' Dealing in used cars and used car parts carries with it the idea of their being used again for their original purpose, without reprocessing. Junk, as the term is ordinarily understood, means articles that have outlived their usefulness in their original form, and are commonly gathered up and sold to be converted into another product, either of the same or a different kind by some manufacturing pro-

cess." *Watseka*, 320 Ill. App. at 201-02.

In the instant cause, the trial court did not feel the addition of the phrase "and the collecting, dismantling, storage, and salvaging of unlicensed, inoperative vehicles" in the Lake County ordinance meant that that was junk since, as in *Watseka*, used cars and used car parts "is not dealing in what is commonly called junk." The court here also considered "the new, current Webster's definition of junk," the variation being, " '[s]econd-hand, worn, or discarded articles of any kind having little or no commercial value.' " Based on the evidence it had heard, the court concluded that there was commercial value to the automobile parts and that the arguably less commercially valuable hulks of the vehicles were removed from the premises within a reasonable period of time.

As to whether the evidence showed he was engaged in the "salvaging" of unlicensed, inoperative vehicles, Zenko argued that the term "salvage" was not defined in the ordinance, was ambiguous, and that the ambiguity should be resolved against the ordinance in favor of his right to the unrestricted use of his property. It was his position that what occurred at Rondout Iron & Metal, for instance, was "salvaging," *i.e.*, the collection of materials having no useable purpose in the form in which they were manufactured and the reprocessing of those materials in some fashion into some new useable item.

The County argues the 1943 *Watseka* decision should be accorded little precedential value in construing the current Lake County zoning ordinance and asserts the definition of the term "junk yard" in the ordinance embodies the current, commonly accepted definition of the term. We agree.

■■■ Initially, we note the County's power to enact a zoning ordinance is provided in section 1 of "An Act in relation to county zoning" (Ill. Rev. Stat. 1987, ch. 34, par. 3151). Inasmuch as an express legislative grant of power or authority includes the grant of power to do all that is reasonably necessary to execute that power or authority (*People ex rel. Foreman v. Sojourners Motorcycle Club, Ltd.* (1985), 134 Ill. App. 3d 448, 451), the city possessed the implied power to define the term "junk yard" in its zoning ordinance. Terms defined in statutes may be defined in any reasonable manner (*Commonwealth Edison Co. v. Property Tax Appeal Board* (1984), 102 Ill. 2d 443, 457), and rules of construction which apply to statutes also apply to ordinances (*Forsberg v. City of Chicago* (1986), 151 Ill. App. 3d 354). Terms defined may be given a broader or narrower meaning than they otherwise would have. (*People v. Burmeister* (1986), 147

Ill. App. 3d 218, 222, *appeal denied* (1987), 113 Ill. 2d 577; *People v. Hope* (1986), 142 Ill. App. 3d 171, 175.) Unless the ordinance indicates otherwise, a property owner should be able to rely on terms used in a zoning ordinance to mean what they are commonly understood to mean (*County of Lake v. Gateway Houses Foundation, Inc.* (1974), 19 Ill. App. 3d 318), and words or phrases not defined in an ordinance are given their ordinary meanings. (*Oberman v. Byrne* (1983), 112 Ill. App. 3d 155.) If there are specific definitions of any terms within an enactment, those definitions, when reasonable, will be sustained for purposes of the act (*People v. Server* (1986), 148 Ill. App. 3d 888, 901; *People v. Harman* (1984), 125 Ill. App. 3d 338, 345) to the exclusion of hypothetical indulgences (*Ballentine v. Bardwell* (1985), 132 Ill. App. 3d 1033, 1038). The construction of a statute, ordinance, or constitutional provision is a question of law (*Oberman v. Byrne* (1983), 112 Ill. App. 3d 155); the reviewing court may make an independent determination of questions of law (*Uhwat v. County Mutual Insurance Co.* (1984), 125 Ill. App. 3d 295) and need not defer to the decision of the trial court. *In re Marriage of Skinner* (1986), 149 Ill. App. 3d 788.

■ We find nothing unreasonable, arbitrary or capricious about the Lake County zoning ordinance's definition of the term "junk yard." We agree with the County that *Watseka* should not control here. No disjunctive construction of conjunctions included in the definition has been urged here, as was the case in *Watseka*, and the *Watseka* definition is dissimilar to the one at issue here. The instant definition of "junk yard" is more broadly defined than in *Watseka* and specifically includes "any land or structure used for a salvaging operation, including \*\*\* the collecting, dismantling, storage, and salvaging of unlicensed, inoperative vehicles." It was clearly within the authority within the legislative body to define this term, and its definition was not unreasonable.

■ The trial court here used a 1976 edition of Webster's New International Dictionary in considering the current meaning of the term "junk." Our 1986 edition of Webster's Third New International Dictionary includes basically the same definition of "junk" as noted in *Watseka*, i.e., "old iron, glass, paper, cordage, or other waste that may be treated so as to be used again in some form." (Webster's Third New International Dictionary 1227 (1986).) It also includes the "variation" noted by the trial court, i.e., "secondhand, worn, or discarded articles of any kind having little or no commercial value." (Webster's Third New International Dictionary 1227 (1986).) The court found significant the fact that the used car parts sold in the

course of Zenko's operation had commercial value. Notably, Webster's defines "junkyard" as "a yard to keep usu. resalable junk." (Webster's Third New International Dictionary 1227 (1986).) Consequently, the fact the used cars and parts on Zenko's lot had commercial value does not serve to remove it from the current definition of "junkyard."

Moreover, the term "junkyard" is defined in Webster's Second College Edition as "a place where old metal, paper, etc. is kept, sorted, and sold *or old cars are junked.*" (Emphasis added.) (Webster's Second College Edition 765 (1972).) A "junker" is defined therein as "an old dilapidated car or truck" (Webster's Second College Edition 765 (1972)), and in Webster's Third New International Dictionary, *inter alia*, as "an automobile of such age and condition as to be ready for scrapping" (Webster's Third New International Dictionary 1227 (1986)). The transitive verb form of "junk" is defined therein as meaning "to abandon or get rid of as no longer of value or use: SCRAP." (Webster's Third New International Dictionary 1227 (1986).) The Random House Dictionary also defines "junkyard" as "a yard for the collection, storage, and resale of junk," and the noun "junk" as "1. any old or discarded material, as metal, paper, rags, etc., 2. anything that is regarded as worthless, meaningless, contemptible, or mere trash." Random House Dictionary of the English Language 775 (1983).

Thus, whether an item is worthless junk or has commercial value appears to depend entirely on one's perspective. As these various definitions suggest, the term "junkyard" reasonably encompasses a place where vehicles are "junked" as such and are cannibalized by degree for salable components until only bare hulks remain, and the hulks themselves are then sold. Webster's defines "salvage" as a noun, *inter alia*, as "something extracted (as from wreckage, ruins, or rubbish) as valuable or having further usefulness," and the transitive verb form as "to rescue or save esp. from wreckage or ruin." (Webster's Third New International Dictionary 2006 (1986).) Zenko's operation was clearly a "salvaging operation" within the ordinary meaning of that term insofar as he purchased and dismantled used cars for useable mechanical and body parts which he stored and sold.

As the County points out, virtually the same definition of "junk yard" as in the Lake County ordinance was upheld in *Board of County Commissioners v. Thompson* (1972), 177 Colo. 277, 493 P.2d 1358, against the property owners' claim that the definition was arbitrary and unreasonable because it included the collection and storage of automobiles as follows:

" 'A building, structure or parcel of land, or portion thereof, used for collecting, storage or sale of waste paper, rags, scrap metal, or discarded materials; or for the collecting, dismantling, storage, salvaging, or demolition of vehicles, machinery or other materials.' " *Thompson*, 177 Colo. at 281, 493 P.2d at 1360.

The eight-acre property there was located in an A—Agriculture district and was used principally for the owners' dwelling and the grazing of their cattle. The hobby of one of the owners was collecting and restoring old Packard automobiles. At the time the owners' use of the property for this purpose was enjoined there were 50 Packards, six Studebakers and four other vehicles, some of the latter of which were licensed for the personal use of the owners. There were also two rows of miscellaneous automobile parts and components used by the owner in repairing and restoring the cars.

■ First, the court rejected the owners' claim that this use of the property was an accessory use. Second, the court found the fact that the definition of "junk yard" embodied a broader concept than ordinarily embraced within that term did not *per se* invalidate the classification in view of the wide prerogative of the legislative body in classifying and regulating uses of land for trade. Although not dispositive, in construing an Illinois statute, decisions of other States construing similar statutes are entitled to respect and consideration. *People v. Ellis* (1984), 128 Ill. App. 3d 180; *In re Marriage of Hunt* (1979), 78 Ill. App. 3d 653.

In *Mayer v. Montclair Board of Adjustment* (1960), 32 N.J. 130, 160 A.2d 30, the supreme court reversed the judgment of the superior court which had held that the plaintiffs' proposed use of property zoned M—1 (light industrial) was not proscribed by the zoning ordinance as being a "junk yard." The plaintiffs' business involved the purchase of old cars, some of which were resold in the condition purchased, others of which were demolished, their useable parts salvaged and sold, and the remainder cut into scrap and sold in that form. Utilizing, *inter alia*, a portion of the same Webster's definition of "junk" as the court in *Watseka* used ("old iron, glass, paper, cordage, or other waste which may be treated so as to be used again in some form"), the superior court found the plaintiffs' business was a "speciality field" and did not fall within the meaning of "the classic junk yard" where all or most of the specific matter named above could be found.

The zoning ordinance there did not define the term "junk yard," but in reversing the superior court, the supreme court referred to

numerous cases from other jurisdictions which found to be "junk yards" places devoted to the storage and commercial use of one type of waste material; *i.e.*, old or junked automobiles.

We find Zenko's attempt to distinguish *Mayer* and *Thompson* unpersuasive. As to *Mayer*, he points to the Board of Adjustments' description of the plaintiffs' proposed use of the property under the variance (which the board denied) which described the used car and used replacement part of the business as "incidental" to the primary function of the enterprise, *i.e.*, the reduction of used, wrecked or unusable cars into ferrous, nonferrous and nonmetallic scrap for subsequent sale at prevailing prices. Zenko contends the record here shows no such activities being conducted by him. In upholding the board's decision not to grant the variance, however, the supreme court relied, *inter alia*, on one case which described an " 'automobile junk yard' as part of the business of 'buying old automobiles, wrecking them and selling serviceable parts as such and junking the residue.' " (*Mayer*, 32 N.J. at 136, 160 A.2d at 33, citing *Parkersburg Builders Material Co. v. Barrack* (1937), 118 W. Va. 608, 613, 191 S.E. 368, 371.) That description essentially describes the business in which Zenko is engaged. Consequently, his assertion the *Mayer* court would reach the same result as the court here did given the same type of activities is untenable.

As to *Boulder County*, Zenko simply asserts "[t]hat decision represents a philosophy which this jurisdiction has rejected" (in *Watseka*) and amounts to "blind deference to legislative judgment" and "form over substance." As noted above, however, terms defined by a legislative body may be given broader or narrower meanings than they otherwise would have, and such definitions will be sustained for the purposes of the enactment to the exclusion of hypothetical indulgences.

The County also cites *Kimbrell v. City of Bessemer* (Ala. 1980), 380 So. 2d 838, and *Laque v. Maryland* (1955), 207 Md. 242, 113 A.2d 893, in support of its position, and Zenko does not distinguish them. In *Kimbrell*, the court did not consider the propriety of the definition of the term "junk yard" *per se*, but based on the fact Kimbrell's business involved the storage of 300 inoperable vehicles until parts were removed therefrom and sold, the city brought suit to enjoin this "junk yard" use. "Junk yard" there was defined similarly to the Lake County Ordinance:

> "[A] lot, land or structure or part thereof being used primarily for the collecting, storage and sale of waste paper, rags, scrap metal or discarded material; or for the collecting, dismanteling

[*sic*], storage and salvaging of machinery or vehicles not in running condition or for the sale of parts thereof." *Kimbrell,* 380 So. 2d at 839.

In *Laque,* the definition of "junk yard" was not reported but based on the activity described in the property owner's testimony, the court concluded he was operating a junk or salvage yard. The property owner there testified:

"[H]e did not run a junk yard because his method of operation was merely to salvage and sell useable parts from old automobiles which remained only temporarily on his lot, and that when such parts had been sold he removed the automobile bodies to a junk yard." (*Laque,* 207 Md. at 251, 113 A.2d at 896.)

The court stated:

"We think that this is too fine a distinction and that, on his own testimony, [the property owner] was maintaining and operating a junk or salvage yard." *Laque,* 207 Md. at 251, 113 A.2d at 896.

Here, too, Zenko draws too fine a distinction between his operation and subsequent operations which reduce the automobile hulks to mere metal.

In further support of the reasonableness of its definition, the County points to the Federal and several midwestern States' highway beautification statutes which include an "automobile graveyard" within the definition of the term "junkyard." In Illinois, the terms "junkyard" and "automobile graveyard" are defined in section 2 of "An Act relating to the control, location, fencing and acquisition of junkyards and scrap processing facilities in areas adjacent to the Federal-Aid Interstate and Federal-Aid Primary Systems of Highways" as shown below:

" '[J]unkyard' means an establishment or place of business which is maintained, operated, or used for storing, keeping, buying, or selling junk, or for the maintenance or operation of an automobile graveyard, and the term shall include garbage dumps and sanitary fills;

\*\*\*

'[A]utomobile graveyard' means any establishment or place of business which is maintained, used, or operated for storing, keeping, buying or selling wrecked, scrapped, ruined or dismantled motor vehicles or motor vehicle parts \*\*\*." Ill. Rev. Stat. 1987, ch. 121, pars. 462(1), (3).

■ Even though not strictly *in pari materia* with the ordinance

definition being considered here, Illinois' statute concerning junkyards in proximity to Federal highways nonetheless lends support to the County's position that its definition of the term "junk yard" reflects a current, common understanding of it. (See *Bergin v. Board of Trustees* (1964), 31 Ill. 2d 566; *Nordine v. Illinois Power Co.* (1964), 48 Ill. App. 2d 424, *reversed on other grounds* (1965), 32 Ill. 2d 421.) In sum, we conclude the County's definition of the term "junk yard" is neither unauthorized by law nor arbitrary, unreasonable, discriminatory or confiscatory, and the court's judgment is reversed.

■ The County's next argument—that the court erred by not requiring Zenko to establish that the actual use of the subject property was a reasonable use—is premised on the assumption we have affirmed the trial court's determination that the definition of junkyard was invalid, which we have not done. Accordingly, we do not address this issue.

■ Further, as pointed out by the County in its reply brief, in the absence of a cross-appeal, Zenko's argument that his automobile storage use of the property is a valid accessory use to the principal use of the sale of used auto parts may not be entertained by this court since it relates to a portion of the court's order which was adverse to Zenko, *i.e.*, that his use of the property constituted a junkyard use as defined in the zoning ordinance. In the absence of a cross-appeal, a reviewing court is not authorized to examine or modify a portion of the order of the trial court and is confined to the errors raised by the appellant. (*National Bank v. City of Lexington* (1985), 138 Ill. App. 3d 805, 809.) As further argued by the County, this court lacks jurisdiction to consider whether the use is an accessory one because Zenko has not exhausted his administrative remedies. The Lake County zoning ordinance provides that the zoning officer shall determine whether a particular use is permitted as an accessory use (Lake County, Ill., Zoning Ordinance, art. IV, §VI A.1 (May 12, 1987)) and appeal from such a determination may be made to the Lake County Zoning Board of Appeals (Lake County, Ill., Zoning Ordinance, art. VI, §I B.4 (May 12, 1987)). Zoning board of appeals decisions, in turn, are subject to judicial review under the Administrative Review Law (Ill. Rev. Stat. 1987, ch. 110, par. 3—101 *et seq.*).

■ Zenko's argument that the County failed to establish that his business was not a lawful nonconforming use also may not be entertained in the absence of a cross-appeal. Moreover, as the County correctly notes, the burden of proving that his use of property fell

within the exception to the application of the zoning ordinance for legal nonconforming uses was Zenko's burden, not its. "[A] party wishing to benefit by an exception must prove that he comes within it." *City of Chicago v. Westphalen* (1968), 95 Ill. App. 2d 331, 338.

For the reasons expressed above, the court's order granting defendant-counterplaintiff Zenko's motion for a directed verdict is reversed and the cause remanded for further proceedings.

Reversed and remanded.

NASH and DUNN, JJ., concur.