THE PEOPLE *ex rel.* ROBERT T. WORDELL *et al.*, Plaintiffs-Appellees, *v.* THE CITY OF CHICAGO *et al.*, Defendants-Appellants.

First District (3rd Division)   No. 77-296

Opinion filed December 13, 1978.

---

[3] Justice Brown participated in this decision while assigned to the Illinois Appellate Court, First District.

William R. Quinlan, Corporation Counsel, of Chicago (Daniel Pascale and Edmund Hatfield, Assistant Corporation Counsel, and Maureen Kelly, law student, of counsel), for appellants.

Nolan, O'Malley and Dunne, of Chicago (Patrick W. Dunne and Michael J. Fogarty, of counsel), for appellees.

Mr. JUSTICE JIGANTI delivered the opinion of the court:

The plaintiffs, Robert and Lillian Wordell, owned two adjoining lots in the City of Chicago, Illinois, which they divided into three lots. They applied for a building permit from the City of Chicago to construct a house on one of the lots resulting from this division. The city, through its

commissioner of buildings, Joseph T. Fitzgerald, denied the permit. The plaintiffs petitioned the circuit court of Cook County for a writ of mandamus to compel issuance of the permit. The trial court granted the writ. The defendants, the city and the commissioner, contend that because the division of the lots does not comply with section 5.7—2 of the zoning ordinance of the City of Chicago (Chicago, Illinois, Municipal Ordinances (1974), ch. 194(A), art. 5, par. 5.7—2) the permit should not be issued.

The parcel of land which the plaintiffs divided consisted of two lots on the northwest corner of the intersection of East Circle Drive and Thorndale Avenue: Lot 17 at 5901 East Circle Drive and lot 18, immediately to the north of lot 17, at 5909 East Circle Drive. On each lot, fronting on East Circle Drive, stands a large, frame, single-family residence, constructed at the turn of the century. The north side yard on lot 17, that is, the area between the house on lot 17 and the property to the north of it, is four feet and some inches wide; the north side yard on lot 18 is four feet wide. Prior to the division, each lot was approximately 50 feet wide and 200 feet deep, with an area of approximately 10,000 square feet. There was an alley directly behind the lots.

The plaintiffs sold the east portions of lots 17 and 18—that is, the segments of the lots on which the frame houses facing East Circle Drive stand—in separate sales. They retained ownership of the remaining west portions of the lots and combined them to form a third, new lot. This third lot, fronting on Thorndale Avenue, has a width of over 60 feet and a depth of over 116 feet on its east side and over 108 feet on its west side, for a total lot area of 6810 square feet. The plaintiffs sought a building permit for the construction of a brick, tri-level home on the third lot. During the processing of the permit, a city planning examiner initially wrote on their application "basic zoning O.K. * * *." But on review by the building commissioner, it was denied and the Wordells instituted this action.

The lots are in a R-1 Single-Family Residence Zoning District. In R-1 districts, bulk regulations, which govern the size and setback of buildings and structures on a lot (Chicago, Illinois, Municipal Ordinances (1974), ch. 194(A), art. 3, par. 3.2), require side yards to be a minimum of five feet in width. (Chicago, Illinois, Municipal Ordinances (1974), ch. 194(A), art. 7, par. 7.8—1.) The side yards of the houses on lots 17 and 18, each less than five feet in width, are, therefore, nonconforming uses: "Use of land * * * which does not comply with all of the regulations * * * governing * * * [the] zoning district in which such use is located." Chicago, Illinois, Municipal Ordinances (1974), ch. 194(A), art. 3, par. 3.2.

Article 5 of the zoning ordinance contains general provisions

applicable to all zoning districts. Section 5.7—2 of that article requires that upon division of improved zoning lots, all resulting improved zoning lots conform to bulk regulations:

> "No improved zoning lot shall hereafter be divided into two or more zoning lots and no portion of any improved zoning lot shall be sold, unless all improved zoning lots resulting from each such division or sale shall conform with all the applicable bulk regulations of the zoning district in which the property is located.* * *."

On its face the statute appears to be violated by the plaintiffs' division because two of the lots resulting from the division—the east portions of lots 17 and 18 which face East Circle Drive and have houses on them—have side yards of less than the five feet in width required by the bulk regulations for an R-1 District. (See Chicago, Illinois, Municipal Ordinances (1974), ch. 194(A), art. 7, par. 7.8—1.) The city and commissioner argue that this violation precludes the issuance of a building permit for the third lot.

The plaintiffs contend that this "plain wording" argument fails because the side yards, although nonconforming uses, are exempt from compliance with the bulk regulation governing side yards. Both of the nonconforming side yards were in existence prior to the enactment of the zoning scheme and prior to the plaintiffs' division of the land. Article 6 governs nonconforming uses. Section 6.2 of article 6 states that a use made nonconforming by the enactment of the zoning scheme can continue, subject to amortization regulations. (Chicago, Illinois, Municipal Ordinances (1974), ch. 194(A), art. 6, par. 6.2.) Section 6.3 of that article exempts preexisting, nonconforming side yards from amortization. (Chicago, Illinois, Municipal Ordinances (1974), art. 6, ch. 194(A) par. 6.3.) The plaintiffs argue that article 6 provides the exclusive regulation of their side yards because it is specifically directed at controlling preexisting, nonconforming uses. They contrast the specific exemption in section 6.3 with section 5.7—2 dealing with bulk regulations and the division of zoning lots, characterizing the latter as a general regulatory provision, only concerned with those buildings and uses established after the zoning ordinance was enacted. (See Chicago, Illinois, Municipal Ordinances (1974), ch. 194(A), art. 5, pars. 5.3 and 5.7—2.) Further, they note that the bulk regulations of article 7 fully incorporate the prescriptions and, therefore, the exemptions of article 6. (Chicago, Illinois, Municipal Ordinances (1974), ch. 194(A), art. 7, par. 7.1.) Thus, the plaintiffs contend, the general requirement of section 5.7—2, that all resulting improved zoning lots comply with applicable bulk regulations, has been met in their division because the five foot width requirement of the bulk regulations is not applicable to a preexisting nonconforming side

yard. To read this otherwise, the plaintiffs state, creates a conflict between the general provisions of article 5 and the specific exemption in article 6.

We find the argument that we should prefer the specific over the general inappropriate here. Section 5.7—2 is a specific provision dealing with the division of zoning lots after the enactment of the zoning ordinance. Nor can we accept the argument that the exemption of preexisting, nonconforming side yards from amortization in article 6 is a blanket provision excepting them from compliance with the rest of the zoning ordinance in all circumstances. The various sections and articles of the zoning ordinance serve different purposes. The purpose of article 6 is amortization, that is, the gradual elimination of nonconforming uses and structures so that eventually the uniformity intended by the zoning scheme will be achieved. (See Chicago, Illinois, Municipal Ordinances (1974), ch. 194(A), art. 6, par. 6.1.) It does not follow that because this purpose of uniformity is satisfied without the inclusion of side yards in the amortization schedule, other purposes of other provisions of the ordinance will also be satisfied.

■■ ■ Neither side has cited an Illinois case which deals with the interaction of section 5.7—2 and a nonconforming use which preexisted the division of an improved zoning lot. Under the plaintiffs' analysis, application of section 5.7—2 would be limited to situations in which the division of an improved zoning lot itself creates a nonconforming use, but would not affect preexisting nonconformities. However, the purpose of section 5.7—2 is to "regulate the intensity of use of zoning areas." (*Mitchell v. Zoning Board of Appeals* (1970), 125 Ill. App. 2d 1, 7, 260 N.E.2d 454, 457.) Application of section 5.7—2, therefore, should be measured by whether the nonconformities on the lots resulting from a division of an improved zoning lot somehow increased the density and intensity of the use of land from what it was prior to the division, not merely by whether a new, nonconforming use was produced by the division.

The interpretation of section 5.7—2 the plaintiffs suggest would defeat that section's purpose of stabilizing the use of land at the predivision level. An example of this can be found in a Massachusetts case, *Howland v. Acting Superintendent of Buildings* (1951), 328 Mass. 155, 102 N.E.2d 423. In that case, a property owner presented an argument similar to the one made by the plaintiffs here. He contended that since his proposed division of an improved zoning lot in no way actually changed the physical condition of the zoning lot (*i.e.*, did not create a new nonconforming use) and since the nonconforming uses on the zoning lot preexisted the enactment of the zoning scheme, the nonconforming uses were excused from compliance with bulk regulations. The *Howland* court rejected this argument and applied the Massachusetts version of section 5.7—2 to the situation, checking to see

whether the division in any way increased the intensity of the use of the land. The court stated that a property owner has no "right to make what is really a change of use of land under the shelter of nonconformity existing when the ordinance was enacted." *Howland*, 328 Mass. 155, 160, 102 N.E.2d 423, 426.

The reasoning in *Howland* is applicable here: The situation created by the plaintiffs' division is: not given a blanket exemption from the application of section 5.7—2 because the nonconformity in question preexisted the division and the zoning scheme. Rather, the plaintiffs' division of the two improved lots into three lots must be evaluated to see if it violates the purpose of section 5.7—2 by increasing or changing or in any way expanding the intensity and density of use of land.

■■ A bulk regulation requiring a minimum width in side yards is predicated on police power to regulate for the public welfare by insuring "light and air to occupants of all buildings * * * [providing] easy access to buildings in case of fire and [preventing] the spread of fire from one building to another." (2. Anderson, American Law of Zoning §9.54 (2d ed. 1976); see also *Wolfe v. Village of Riverside.* (1965), 60 Ill. App. 2d 164, 208 N.E.2d 833.) The minimal deficiencies in the width of the side yards on lots 17 and 18 were offset by the size of the lots prior to the division. If access to the houses was hampered by the deficient side yards, it was more than compensated for by the length of the lots and the easy approach to the houses through the alleyway behind them. Light and airways diminished by the narrowness, too, were equalized by the uncluttered, long, back space on both lots. The plaintiffs' partitioning of the west rear portions of lots 17 and 18 and their plan to construct a house on these back portions neutralizes the effect of these compensations, limits the access of the houses to the alleyway behind and accordingly increases the intensity of the use of land. As noted in *Howland*, some of the consequences which might follow from the plaintiffs' division of the improved zoning lots here were exactly those intended to be prevented by the enactment of bulk regulations prescribing the width of the side yards. See *Howland*, 328 Mass. 155, 160, 102 N.E.2d 423, 426.

■■■ The writ of mandamus to compel the issuance of a building permit is not one of absolute right, to be awarded when a reasonable argument is made for its issuance. (*Solomon v. City of Evanston* (1975), 29 Ill. App. 3d 782, 331 N.E.2d 380.) In order to be entitled to it, a petitioner must show that there is a clear, unambiguous right to what is requested and that the official action refusing what is requested is devoid of support. "Anything less than strict and complete compliance with all necessary and applicable provisions [for a building permit] must result in denial of the writ." (*Solomon*, 29 Ill. App. 3d 782, 790, 331 N.E.2d 380, 386.) In this case, the plaintiffs have not demonstrated a clear and unambiguous right.

While their infraction of section 5.7—2 may be slight, it makes their claim for a building permit equivocable.

■■ The plaintiffs also argue that as applied to them strict enforcement of the requirements of section 5.7—2 is unconstitutional because it deprives them of property without due process. However, the record does not disclose evidence that the application of section 5.7—2 through the strict enforcement of the side yard bulk regulation is unreasonable or arbitrary in this case. There has been no showing that other lots in the area have been excused from compliance with the zoning scheme in situations similar to the one at bar. (See *e.g., Wolfe v. Village of Riverside.*) While it does appear that the plaintiffs would economically benefit from the division of their property, information concerning this and the extent of their deprivation because of the ordinance is not evidence in the record. It can be argued that the majority of property owners would similarly be able to receive greater monetary rewards from their property if the zoning scheme did not apply. (See *Howland.*) Our analysis shows that the minimum width requirement for side yards, in this instance, bears a relationship to the public welfare. No evidence in the record has overcome this presumption. (See *Galpin v. Village of River Forest* (1962), 26 Ill. 2d 315, 187 N.E.2d 233.) Therefore, we reverse the order of the circuit court of Cook County issuing the writ of mandamus.

Reversed.

SIMON, P. J., and McNAMARA, J., concur.