JAMES D. CONSTANTINE *et al.*, Plaintiffs-Appellees, v. THE VILLAGE OF GLEN ELLYN *et al.*, Defendants-Appellants.

Second District   No. 2—90—0164

Opinion filed July 25, 1991.

William E. Jegen, P.C., of Glen Ellyn (William E. Jegen, of counsel), for appellants.

Robert V. Gildo, Ltd., of Wheaton (Robert V. Gildo, of counsel), for appellees.

JUSTICE NICKELS delivered the opinion of the court:

This appeal arises from a suit for a writ of *mandamus* filed by plaintiffs, James D. and Carol J. Constantine, in the circuit court of Du Page County to compel defendants, the Village of Glen Ellyn and William H. Hansen, as the building and zoning official of Glen Ellyn (Village), to issue a building permit to plaintiffs for certain property. Plaintiffs had been denied a building permit on February 3, 1987, due to a certain zoning ordinance. Following a trial, the circuit court entered an order on January 18, 1990, which ordered the Village to issue a building permit to plaintiffs upon review and approval of the building plans.

The record establishes that in September 1985 plaintiffs entered into a contract to purchase the subject property from the estate of John Tierney for the price of $70,100. On October 2, 1985, the subject property was conveyed by executor's deed. The property, commonly known as 731 Park Boulevard in Glen Ellyn, Illinois, was 50 feet in width and had a depth of about 160.6 feet. The legal description of the property is as follows:

"The North ½ of Lot 9 in Collin's and Gauntlett's Lake Glen Ellyn, being a Resubdivision of Lots 22 and 29 inclusive, and 33 to 68 inclusive in John A. Brown's Addition to Glen Ellyn, being a Subdivision in Section 11, Township 39 North, Range 10, East of the Third Principal Meridian, according to the Plat of

said Collin's and Gauntlett's Lake Glen Ellyn, recorded October 21, 1914 as Document 118383, in Du Page County, Illinois."

Deeds show that John Tierney and his wife, Agnes, took title to the south one-half of lot 9 and the north one-half of lot 9 at separate times, the north one-half being conveyed in 1946. The north and south halves of lot 9 together have a north-south frontage of 100 feet and an east-west depth of about 160 feet. The south one-half of lot 9 was conveyed by a Tierney estate executor's deed dated December 14, 1985, to Daniel L. and Cynthia H. Downey.

In January 1987 plaintiffs submitted an application for a building permit for the construction of a single-family residence on the subject property to the Village. On February 3, 1987, the Village sent plaintiffs a letter which denied a building permit for the subject property under sections 104 and 300(5) of the zoning ordinance for the Village of Glen Ellyn (hereinafter 1974 ordinance) (Glen Ellyn, Ill., Zoning Ordinance No. 1904—Z, art. 1, §104(2); art. 3, §300(5) (1974)). The letter provided that no permit would be issued unless plaintiffs were granted a variance by the Glen Ellyn Village Board of Trustees (Village Board). Plaintiffs filed a complaint for *mandamus* on March 5, 1987. Plaintiffs were allowed to supplement their prayer for relief on November 13, 1989, by asking the court to declare the north one-half of lot 9 a "buildable lot" under the 1974 ordinance.

James D. Constantine testified that after looking at the subject property, which was for sale, his wife and he expressed an interest in purchasing it from the Tierney estate. He explained that he read an article in a newspaper on May 29, 1985, which involved different property owned by the Korstads. According to the article, the Korstads had sought a variation from the minimum-lot requirements from the Village regarding their property. The Korstad property had 50.4 feet of frontage but only an area of 6,100 square feet. The article referred to a "grandfather" provision regarding small lots.

Concerned about the size of the subject property, Constantine met with Hansen about two weeks after reading the article. Constantine told Hansen that he was interested in purchasing the subject property in order to build on it. Hansen knew the property and told Constantine it was a buildable lot because the property was "surely" recorded prior to 1961. Hansen would not give Constantine written documentation that the lot was buildable.

Constantine wrote a letter to the representative of the Tierney estate regarding purchasing the subject property. The estate agreed to sell the property but required that a contingency provision in the sale contract, *i.e.*, the ability to obtain a building permit on said property,

be deleted. Constantine then sent his wife to the Village to get a copy of the "grandfather" provision, section 104(2) of the 1974 ordinance. After reading section 104(2), plaintiffs decided to purchase the property without the contingency in the sale contract.

In July 1985, Constantine again spoke to Hansen about site development requirements because of an unusual grade to the subject property. Hansen said he knew the property and that because it was so steep he did not believe there would be a water problem. Hansen told Constantine it was a buildable lot. Hansen also said that neighbors were calling him inquiring about the property and that he told them it was a buildable lot.

In September 1985 Constantine asked Chicago Title and Trust Company to do a title search of the property. He received a tract-book search from Chicago Title and Trust Company for the property. The tract-book search showed that the subject property had been conveyed a few times since 1914, until the Tierneys acquired a deed to the subject property in 1946. Deeds indicate that the north and south halves of lot 9 had been conveyed separately over the years before 1961.

Plaintiffs then decided to purchase the property and retained an attorney. After plaintiffs purchased the property, Constantine went to see Hansen in late October to early November 1985 to ask about recommending an architect to draw plans for a house on the property. Hansen would not recommend anyone but told Constantine he was looking forward to reviewing the plans.

Plaintiffs hired an architect, Fred Johnson, to draw plans for a single-family residence on the property. Johnson drew initial sketches, and plaintiffs paid him $1,400 for his work. Then plaintiffs brought the sketches to Tom Gale, an architect, to complete the plans and apply for a building permit. Plaintiffs paid Gale for his services on January 27, 1987. Plaintiffs received the February 3, 1987, letter from Hansen which denied their application for a building permit. Other than the reference to the lot size, there was no indication that there was anything wrong with the plans. Plaintiffs also paid Harold Steinbrecher for the site plan needed for the permit.

In March 1986, Johnson wanted to meet with Hansen about the building plans, but Hansen would not meet with him. Constantine telephoned Hansen, and Hansen told him that the Village attorney was going to review whether the lot was a buildable lot. Constantine called the Village attorney, William Jegen, and was told that Jegen was still reviewing whether the property was a buildable lot. Plaintiffs hired an attorney, Robert Gildo, in April 1986.

During cross-examination Constantine said that the sale contract did contain a provision that it was "subject to said property being a lot of record prior to January 1, 1961 as evidenced by a commitment by the title insurance company referenced above." Constantine said he was never told whether that condition had been met but closed on the property anyway leaving these matters to his attorney.

Constantine testified on cross-examination that at the time of closing he was concerned about the gravel driveway that partially existed on the subject property. The gravel driveway serviced the garage on the south one-half of lot 9. The driveway began at the street and went onto both halves of lot 9. There was a flagstone retaining wall at the entryway of the driveway on both sides. Plaintiffs had $400 held in escrow at the time of the closing for removal of that part of the driveway which encroached on the north one-half of lot 9. The flagstone portion was removed. He later removed the gravel on his property and put down railroad ties along the lot line. He also said that except for mowed lawn around the house that stood on the south one-half of lot 9, the property was rustic. Constantine admitted that plaintiffs did not apply for a variation after receiving the February 3, 1987, letter or pursue any appeal procedure with the Village prior to filing the *mandamus* action.

Tom Gale testified for plaintiffs that he had prepared building plans for them based upon certain sketches. He also had a topographical survey and site plan done. Gale applied for a building permit for the property with the Village on January 27, 1987.

Plaintiffs rested, and defendants' motion for a directed finding was denied. Defendants called Helen Pierce as their first witness.

Pierce lived at 735 North Park in Glen Ellyn since December 1958, and the Tierneys lived in the house south of the Pierce property. Pierce viewed certain photographs of the subject property and indicated that the subject property looked substantially the same when Mr. Tierney was alive. She identified a birdhouse and several plants, bushes and trees which were on the subject property. She said that part of the north and south halves of lot 9 were maintained in a similar fashion, *i.e.*, no formal lawn and the leaves were allowed to fall and decompose. Mr. Tierney placed flagstone on the subject property, planted perennials, and made planting areas.

Louis Pierce testified for defendants. When he and Helen Pierce moved into their house, there were remnants of a fence between their property and the north one-half of lot 9 owned by the Tierneys. He and Mr. Tierney agreed to and did replace the fence between their property. He also testified that Mr. Tierney planted flowers, perenni-

als, and did other gardening tasks on the subject property. Mr. Tierney repaired and rebuilt the flagstone retaining walls by the driveway. Pierce's property was 100 feet by 160 feet. He saw the Tierneys use all their property, *i.e.*, both halves of lot 9.

Carol Constantine was called by defendants as an adverse witness. She said that plaintiffs changed architects because Gale was cheaper than Johnson. She said that plaintiffs were not told in March 1986 by the Village that the property was not buildable. However, she was impeached with her deposition wherein she said that plaintiffs were advised that the property was not buildable although her response did not indicate that the Village informed them. On direct examination Carol Constantine also said that they changed architects because Johnson was too busy to complete the project. They went to Gale because he knew the Village code. She said she was confused at her deposition and that no one had told plaintiffs the property was not buildable in March 1986. Carol Constantine said that when she picked up a copy of section 104 in June 1985, Hansen told her that if they applied for a permit that day, he would give it to them.

Cynthia Downey was called to testify by defendants. She purchased the south half of lot 9 from the Tierney estate and resided there since January 1986. In late March to early April 1986, James Constantine spoke to her about the petition that neighbors had started concerning his property. He told Downey that if they (Downeys) would cooperate with him regarding the buildability of his property with the Village, he would allow the Downeys to continue to use that part of their driveway which ran on the Constantines' property. He would not put the agreement in writing.

Downey identified some photographs that she took of the property in the fall of 1988. She also identified a survey of her property. She located a survey stake at the center line between the north and south halves of lot 9 in the back of the property. She found a pipe in the northwestern corner, and she and her husband marked these two locations with stakes. They ran a string between these stakes to mark the boundary line between the north and south halves of lot 9. Photographs were taken, and these photographs showed that the Downey driveway was about three feet over the center line on the north one-half of lot 9. There was a large oak tree in the front yard which was 83 inches from the center line. Downey also identified photographs of plants and shrubs which were on the north half of lot 9 which were visible from windows and a sun-room of her house. She said that electrical service to her house extended over the north half of lot 9.

On cross-examination Downey testified that when they purchased the house they were aware that the driveway encroached on plaintiffs' property. They asked for a license agreement from plaintiffs regarding the driveway. She said that the survey showed the driveway encroached 1.4 feet onto the north half of lot 9, but after they measured they realized it encroached over three feet. Based upon certain questions from plaintiffs' attorney, there was an issue raised regarding whether the pipe used by Downey at the northwest corner near the driveway to mark the center line was the actual surveyor's marker.

Defendants called William Hansen to testify. He identified the application for a permit and plans submitted by Gale in early 1987. He then wrote the February 3, 1987, letter to plaintiffs which denied the permit due to the zoning problem. Hansen identified a letter to the Pierces written by Will Allen, the director of planning and development of the Village. This letter contained an opinion of the buildability of the north half of lot 9. Hansen did not review the plaintiffs' plans for compliance with building, electrical or plumbing codes, and he did not submit them for site-plan review to the Village engineer.

Hansen testified that it was routine practice in the Village that if a person had a question regarding the buildability of an undersized lot that the person submit a legal description and/or survey and a letter requesting an opinion on buildability. A request for such an opinion was made by 14 people on the 600/700 block of Park Boulevard regarding plaintiffs' property in a letter dated February 21, 1986. A letter of May 15, 1986, was then sent to Louis Pierce from Will Allen regarding the buildability of plaintiffs' property. Hansen never received a formal written request for such an opinion in the summer of 1985. Hansen said that he saw James Constantine in the summer of 1985 or sometime later, and Constantine only asked him about recommending an architect. Hansen never told Constantine that the north half of lot 9 was buildable.

Hansen explained on cross-examination that he gave final approval to building plans for a permit. If there were minor problems with plans, notations would be made on the plans and discussed with the applicants. On redirect, Hansen said he did not go through the process of reviewing an application with respect to the building codes if there was a substantial zoning problem with the property.

Allen, the director of planning and development for the Village testified regarding the intent of the Village in passing paragraph No. 5 of section 300 of the 1974 ordinance. He explained that the Village did not want properties which conformed to the Code to be changed

so that they no longer conformed. The amendments were designed to reinforce other zoning regulations. He also described the process of adopting the 1989 ordinance.

Allen said that as of May 1985 it was routine practice for the Village not to answer oral inquiries on the buildability of undersized lots. He explained how the whole zoning ordinance had to be read and checked to determine whether property met the requirements. Through an offer of proof, Allen testified that the Village's interpretation and application of the 1974 ordinance as applied to plaintiffs' property was consistent with other applications of the ordinance in the past. Allen also said that in November 1987 he told the Downeys that their property violated the 1974 ordinance and something would have to be done to correct it.

He further testified that under the 1989 ordinance the Tierney estate would have had to treat the north and south halves of lot 9 as one zoning lot. The 1989 ordinance removed any question regarding two separate lots in common ownership. Allen also said that about 50% of the lots in the R-2 zoning district are less than 66 feet in width.

On redirect Allen defined "lot of record" in the 1974 ordinance as an area of land which was part of a subdivision recorded in the county recorder's office or described by metes and bounds and so recorded. The plat of subdivision did not show the north half of lot 9 as a lot. Allen said that the north half of lot 9 was not a "lot of record" and, therefore, section 104(2) did not apply to plaintiffs' property. Allen described other instances involving undersized lots where the owners were required to purchase more property to widen the lot.

Harold Steinbrecher, a civil engineer and land surveyor, testified that he inspected and measured both halves of lot 9 on December 2, 1989. The court barred his testimony, however, because he was an expert, and there was a failure to comply with Supreme Court Rule 220 (107 Ill. 2d R. 220). Defendants then made an offer of proof. Steinbrecher described the procedure he used to find the center line between the north and south halves of lot 9. The oak tree was $6^1/_{10}$ feet from the center line. On cross-examination he said that the only obstructions to moving the driveway to the south (so that it was entirely on the Downey property) were the oak tree and a flagstone walk. As an offer of proof by defendants, Steinbrecher said the iron pipe near the concrete apron of the driveway (the one used by Downey to measure) was on the "south line of the north half as extended" but was not part of "this lot."

The parties rested, and the court considered written closing arguments by the parties. On January 18, 1990, the court entered its opinion and order. The Village was ordered to issue a permit to plaintiffs upon review and approval within 30 days of plaintiffs' building plans (or as provided by further order of court). The matter was continued until February 21, 1990, for status. However, defendants filed a notice of appeal on February 16, 1990, and the January 18, 1990, order was stayed pending appeal. We have determined that we have jurisdiction to decide this appeal.

We first address the Village's contention that this appeal should be dismissed because plaintiffs failed to exhaust their administrative remedies. It correctly points out that plaintiffs did not appeal Hansen's decision to the Glen Ellyn Zoning Board of Appeals (Zoning Board) or seek a variance. The Village argues that under *Lunar Oil Co. v. Ladendorf* (1970), 131 Ill. App. 2d 487, the *mandamus* action was premature and plaintiffs should have appealed to the Zoning Board. Any decision by the Zoning Board would have been reviewable under the Administrative Review Act as plaintiffs' exclusive avenue of judicial review according to the Village. Ill. Rev. Stat. 1989, ch. 110, par. 3—101 *et seq.*

While the Village mentions that no variance was sought by plaintiffs, its argument is directed at the fact that plaintiffs did not seek review of Hansen's decision through an appeal before the Zoning Board. We therefore will only consider whether plaintiffs should have appealed to the Zoning Board since bare contentions without argument do not merit consideration on appeal. (*Fuller v. Justice* (1983), 117 Ill. App. 3d 933.) In any event, to require plaintiffs to seek a variation under the facts of this case would be tantamount to a forced admission that Hansen's interpretation was correct and that the restrictions applied to them. See *Kuney v. Zoning Board of Appeals* (1987), 162 Ill. App. 3d 854.

The parties argue the validity and application of the exhaustion doctrine to the facts of this case and, in particular, the relevance of *Lunar Oil Co.* (131 Ill. App. 2d 487). It is not necessary, however, to make a determination on these points due to the "appeal" procedure set forth in the 1974 ordinance. Under the Illinois Municipal Code (Code) (Ill. Rev. Stat. 1989, ch. 24, par. 11—13—3), the Village designated a building and zoning officer, Hansen, to enforce the 1974 ordinance as provided in section 11—13—3. (Ill. Rev. Stat. 1989, ch. 24, par. 11—13—3.) Pursuant to section 11—13—3(D), the Zoning Board is required to hear and *decide* appeals from and review any order, requirement, decision or determination made by Hansen. (Ill. Rev. Stat.

1989, ch. 24, par. 11—13—3(D).) All final decisions of the Zoning Board are subject to judicial review under the Administrative Review Act (Act) (Ill. Rev. Stat. 1989, ch. 24, par. 11—13—13). When acting in a quasi-judicial capacity, the decision of a Board of Appeals is reviewable as a final administrative decision under the Act; however, when acting as a legislative committee, its recommendation to the legislative body is not reviewable as there is no final reviewable order. *Traders Development Corp. v. Zoning Board of Appeals* (1959), 20 Ill. App. 2d 383.

Under the 1974 ordinance herein, the Zoning Board conducts hearings and can make written findings of fact and make recommendations to the Village Board regarding any order, requirement, decision or determination made by Hansen. (Glen Ellyn, Ill., Zoning Ordinance No. 1904—Z, art. 7, §700(3)(A) (1974).) The Zoning Board does not decide the appeal before it as required under section 11—13—3(D) of the Code and thus contravenes the enabling legislation. (Ill. Rev. Stat. 1989, ch. 24, par. 11—13—3(D).) An ordinance cannot add to, subtract from, or affect the provisions of a statute, and, if it is in conflict with a statute, it is invalid. *Traders Development Corp.*, 20 Ill. App. 2d at 392.

The Village acknowledges that its 1974 ordinance "attempts" to establish a contrary appeal scheme from the statute and is therefore void. It argues that, despite this invalidity, plaintiffs and the Village were obligated to follow the statutory appeal process and cites *Bank of Elk Grove v. City of Joliet* (1988), 171 Ill. App. 3d 321, and *Melrose Park National Bank v. Zoning Board of Appeals* (1979), 79 Ill. App. 3d 56. These cases involved zoning administrative decisions wherein a question was raised on appeal concerning the number of votes necessary to approve certain zoning requests. In both cases the appellate court found the local method invalid under the Code, reversed and remanded for further proceedings. However, neither case raised an issue concerning the exhaustion of administrative remedies had the parties not sought review at the local level. Furthermore, each case involved a final decision which is reviewable under the Act. Here, the Zoning Board was not authorized to make a final administrative decision as to Hansen's action. The lack of a final order by the Zoning Board would prevent an appeal under the Act. (Ill. Rev. Stat. 1989, ch. 24, par. 11—13—13; see *Jackson v. Village of Rapids City* (1973), 16 Ill. App. 3d 153.) These cases do not persuade us to require plaintiffs to have appealed to the Zoning Board.

■■ An aggrieved party may seek judicial review of an administrative decision without complying with the exhaustion of remedies

doctrine where the agency cannot provide an adequate remedy or where it is patently futile to seek relief before the agency. (*Castaneda v. Illinois Human Rights Comm'n* (1989), 132 Ill. 2d 304.) However, the exhaustion requirement cannot be avoided simply because relief may be, or even probably will be, denied by the local authorities. (*Northwestern University v. City of Evanston* (1978), 74 Ill. 2d 80.) The futility doctrine, as it is sometimes called, is limited to the factual situation presented on a case-by-case basis. *Dock Club, Inc. v. Illinois Liquor Control Comm'n* (1980), 83 Ill. App. 3d 1034.

■ The Village herein allowed the Zoning Board to only make recommendations to the Village Board regarding an appeal of Hansen's decision. We have found that this provision was invalid under the Code. While the Village argues that judicial review could have been avoided if plaintiffs had succeeded before the Zoning Board, this argument fails to recognize that the Zoning Board's decision was not final and was subject to a decision by the Village Board. Regardless if the Zoning Board reversed Hansen's decision, the Village Board was the final decision maker. It is clear that the Village believed Hansen's interpretation of the 1974 ordinance to be correct, and an appeal to the Zoning Board, which ultimately would be determined by the Village Board, would have been futile. As we have stated, there would be no final order by the Zoning Board, and only final orders by the Zoning Board are reviewable under the Act as provided in section 11—13—13 of the Code. (Ill. Rev. Stat. 1989, ch. 24, par. 11—13—13.) Thus administrative review of the Zoning Board's recommendation would not have been available to plaintiffs. The 1974 ordinance provided no meaningful appeal procedure which would have been reviewable under the Act, and, therefore, plaintiffs were not required to appeal Hansen's decision to the Zoning Board.

In the next issue, the Village contends that the trial court erred in its interpretation of the 1974 ordinance. It argues that the ordinance requires the continued conformity with lot-size restrictions once a tract has obtained conforming status. To arrive at this conclusion, the Village asserts that implicit in its definition of lot is the concept of common ownership and usage. Accordingly, the Village notes that the north one-half of lot 9 and the south one-half of lot 9 were owned by the Tierneys when the 1974 zoning ordinance and applicable subsections were passed or added. Together the halves made up a "lot" because of the common ownership and usage by the Tierneys, and this "lot" met the requirements of the R-2 district. Under sections 300(3) and 300(5) of the 1974 ordinance, this "lot" could not be reduced in size below the minimum requirements of 66 feet of frontage and 8,712

square feet in area. The Village argues that it has applied the 1974 ordinance this way in the past. Glen Ellyn, Ill., Zoning Ordinance No. 1904—Z, art. 3, §§300(3), (5) (1974).

■ Terms defined in statutes may be defined in any reasonable manner, and rules of construction which apply to statutes also apply to ordinances. (*County of Lake v. Zenko* (1988), 174 Ill. App. 3d 54.) The primary object is to ascertain and give effect to the intention of the law-making body as disclosed by the language used. (*Reitman v. Village of River Forest* (1956), 9 Ill. 2d 448.) Legislative intent of a particular provision is initially determined by examining the subject section's language in context with the remaining provisions of the enactment. (*Alonso v. O'Grady* (1987), 153 Ill. App. 3d 159.) It is not the province of the courts to inject provisions not found in a statute. (*In re Objection of Linda Lou Cook to Referendum Petition* (1984), 122 Ill. App. 3d 1068.) The construction of an ordinance is a question of law, and the reviewing court may make an independent determination of questions of law. (*County of Lake*, 174 Ill. App. 3d at 60.) A zoning ordinance is in derogation of common-law rights to the use of property and should be strictly construed in favor of the right of the property owner to the unrestricted use of the property. *Oak Park Trust & Savings Bank v. Village of Elmwood Park* (1969), 113 Ill. App. 2d 121.

Under section 11—13—1 of the Code, the Village had the authority to establish zoning districts and set standards to which buildings therein had to comply as well as the authority to regulate and limit the intensity of the use of lot areas. (Ill. Rev. Stat. 1989, ch. 24, par. 11—13—1.) Minimum-lot area limitations which are not arbitrary and unreasonable have been approved by our supreme court. (*Galpin v. Village of River Forest* (1962), 26 Ill. 2d 515; see *Reitman*, 9 Ill. 2d 448.) The minimum-lot requirements set forth in the 1974 ordinance required 66 feet in width and 8,712 square feet. However, section 104(2) provided an exception to these requirements:

> "Any lot which was *of record* prior to the adoption of the Glen Ellyn Zoning Ordinance of 1961 that does not meet the requirements of this ordinance as to width or area may be used for a single family residence, provided the adjoining *lots* on both sides are improved or insufficient land is adjacent thereto to provide the required width or area and said lot has a minimum 50 foot width and 75 per cent of the lot area requirement. Side yards shall not be less than 6.6 feet." (Emphasis added.) (Glen Ellyn, Ill., Zoning Ordinance No. 1904—Z, art. 1, §104(2) (1974).)

There is no dispute in the Village's initial brief that the north one-half of lot 9 was a lot of record prior to 1961 as evidenced by deeds. Nor is there any issue raised with respect to the fact that the north half of lot 9 has a minimum 50 foot width and meets the 75% requirement of the lot area requirement.

■■ The Village's argument on appeal, in its various facets, rests on its interpretation of the term "lot." It asserts that common ownership and usage of a tract, parcel or area of land constitutes a "lot" for zoning purposes and that implicit in the definition of the term lot is a common ownership. The common ownership and usage of the north one-half of lot 9 with the south one-half of lot 9 by the Tierneys when the 1974 ordinance and amendments were passed made one lot which conformed to the minimum zoning requirements according to the Village. Under sections 300(3) and 300(5), this lot (both halves of lot 9) could not be divided into substandard parcels, *i.e.*, a conforming tract could not be reduced to two nonconforming tracts.

"Lot" is defined as:

> "An area of land of sufficient size to meet zoning requirements for a permitted or special use. Such lot shall have frontage on an improved public street, or on an approved private street, and may consist of:
>
> (a) A single lot of record;
>
> (b) A portion of a lot of record;
>
> (c) A combination of compete lots of record, of complete lots of record and portions of lots of record, or of portions of lots of record." Glen Ellyn, Ill., Zoning Ordinance No. 1904—Z, art. 9 (1974).

"Lot of record" is defined as "an area of land which is part of a subdivision recorded in the office of county recorder, or which is described by metes and bounds and *has been so recorded*." (Emphasis added.) Glen Ellyn, Ill., Zoning Ordinance No. 1904—Z, art. 9 (1974).

Sections 300(3) and (5) provide the following:

> "(3) No yard or lot existing at the time of passage of this ordinance shall be reduced in dimension or area below the minimum requirements set forth herein. Yards or lots created after the effective date of this ordinance shall meet at least the minimum requirements set forth herein.
>
> ***
>
> (5) No lot improved with a building or buildings shall hereafter be divided into two or more lots and no portion of any lot which is improved with a building or buildings shall be sold, unless all lots resulting from each division or sale and improved

with a building or buildings shall conform with all the bulk regulations of the Zoning District in which the property is located." Glen Ellyn, Ill., Zoning Ordinance No. 1904—Z, art. 3, §§300(3), (5) (1974).

The Village relies upon several cases to support its argument of common ownership and usage. In *Weber v. Village of Skokie* (1968), 92 Ill. App. 2d 355, plaintiffs sold lots 11 and 12, which contained a house and garage, and retained vacant lot 13, which was contiguous to the other lots and substandard. The *Weber* court found that plaintiffs had not relied upon a plat of subdivision, but had utilized the three parcels as one upon notice of and consonant with the definition of the terms "lot" and "lot of record." "[L]ot" was defined as a "parcel of land occupied or intended for occupancy by a use permitted in this Ordinance, including one (1) main building together with its accessory buildings, ... and having its principal frontage upon a street." (*Weber*, 92 Ill. App. 2d at 363.) "[L]ot of record" was defined as "[a] lot which is part of a subdivision, the map of which has been recorded in the office of the Recorder of Deeds of Cook County, Illinois." *Weber*, 92 Ill. App. 2d at 363.

We find that the definition of "lot" in *Weber* clearly rested upon the usage or intended usage of the parcel of land. There was also an indication in the opinion that another provision in the ordinance referred to parcels "adjoining and contiguous to a vacant lot on either side held under common ownership at any time after 1946" which was the situation with the *Weber* plaintiffs. No such provision is present in the 1974 ordinance herein. While the *Weber* court did not specifically rely on the common-ownership provision but rested its decision on the term "lot," we find the presence of such language sufficient to find *Weber* not controlling.

The same court in *Lipski v. Smith* (1978), 57 Ill. App. 3d 491, relied upon *Weber* in determining that three substandard lots were used as one "lot of record." A lot was defined as a "parcel of land occupied or suitable for occupancy by one main building or, use with accessory buildings, including the open spaces required by this ordinance." The *Lipski* court concluded that the house sat on lots 1 and 2, which were dependent on lot 3 to meet side-yard requirements. Thus, lots 1, 2 and 3 constituted a lot of record (which was not defined in the ordinance). It relied upon its earlier *Weber* decision, which we find distinguishable, and also relied upon *O'Laughlin v. City of Chicago* (1976), 65 Ill. 2d 183, and *Ganley v. City of Chicago* (1974), 18 Ill. App. 3d 248, which we subsequently distinguish.

The Village further cites to *Mitchell v. Zoning Board of Appeals* (1970), 125 Ill. App. 2d 1, *Ganley v. City of Chicago* (1974), 18 Ill. App. 3d 248, and *Citizens Bank & Trust Co. v. City of Park Ridge* (1972), 5 Ill. App. 3d 77, in support of its position that "lot" means common ownership and usage. Although referred to in its next issue, the Village also relies upon *O'Laughlin* (65 Ill. 2d 183), *Ganley v. City of Chicago* (1980), 81 Ill. App. 3d 877, and *People ex rel. Wordell v. City of Chicago* (1978), 67 Ill. App. 3d 321, which we address here.

*Mitchell, Ganley* (1974), *Ganley* (1980), *O'Laughlin*, and *Wordell* are clearly distinguishable. All of these cases come under the zoning code for the City of Chicago which had a separate and distinct definition for a "zoning lot." "[Z]oning lot" was defined as "a single tract of land located within a single block, which (at the time of filing for a building permit) is designated by its owner or developer as a tract to be used, developed, or built upon as a unit, under single ownership or control. Therefore, a 'zoning lot or lots' may or may not coincide with a lot of record." (*O'Laughlin*, 65 Ill. 2d at 187.) Thus, the term "zoning lot" had a clear and specific meaning to include parcels of land in common ownership and usage to be treated as one zoning lot. Although the Village attempts to minimize the concept of "zoning lot" by referring to and claiming that "zoning lot" is the same as lot herein, that is not the case. "Zoning lot" is not merely another name for lot but was specifically defined as parcels in common ownership and usage. No such definition is present in the instant case. "Lot" herein may include a combination of complete lots of record, complete lots of record and portions of lots of record, or of portions of lots of record. However, this definition does not require that common ownership and usage merge the lots into one. We also note that the Village amended the 1974 ordinance in 1989 to include a definition for zoning lot which is defined as a single tract of land in common ownership and added a section regarding contiguous, substandard lots in common ownership constituting one conforming zoning lot. (Glen Ellyn, Ill., Zoning Ordinance No. 3617—Z, art. 2, §10—2—2; art. 4, §10—4—1(H) (1989).) The addition of a new provision in a statute by amendment is an indication of the absence of its implied or prior existence. (*People v. Jones* (1981), 99 Ill. App. 3d 882.) Although the Village claims that these changes do not mean a change in policy from its earlier 1974 ordinance, its previous definition of lot did not include common ownership and usage, and we will not inject that provision into the 1974 ordinance. *In re Objection of Cook*, 122 Ill. App. 3d at 1072.

*Citizens Bank & Trust Co.* (5 Ill. App. 3d 77), also cited by the Village, excepted from its provisions on lot size single lots of record which were separately owned from land adjoining on either side. This provision distinguishes this case from the facts herein where the 1974 ordinance makes no specific provision for separately owned as opposed to commonly owned lots. In *Galpin v. Village of River Forest* (1962), 26 Ill. 2d 515, the court determined that a grandfather provision did not apply and then viewed the two contiguous lots as one unit based upon plaintiff's use of the property. *Reitman v. Village of River Forest* (1956), 9 Ill. 2d 448, did not involve contiguous lots but one substandard lot, and plaintiffs contended that the ordinance was unconstitutional. A grandfather provision did not apply in *Reitman* either.

The Village also contends that in view of *O'Laughlin, Ganley* (1974) and the other cases, it adopted a zoning code substantially identical to these cases. It argues that under *O'Laughlin* and *Ganley* (1974), a grandfather clause such as section 104(2) does not exempt undersized lots that are part of an improved and conforming parcel. It further claims that sections 300(3) and 300(5) do not allow an improved parcel to be reduced in size and follow the language found in *O'Laughlin* and *Ganley* (1974). This position fails to consider the fact that these cases involved a separate and distinct provision for commonly owned and used tracts of land referred to as "zoning lot" which is not present in this case. The Village may have added sections 300(3) and 300(5) to its ordinance in view of these cases, but it failed to adopt the definition of zoning lot to make these provisions apply to the property in question here.

The Village refers to the trial judge's remark during a hearing on its motion to dismiss wherein the judge stated that "lot contemplates some unit of ownership of real property." The Village interprets this remark as meaning that the determination of a tract of land as a lot must be examined as to its record ownership and usage. It later states that the trial judge acknowledged by this remark that any area of land held in one ownership at any point in time becomes a lot. We do not read this into the court's remark. The court completed the phrase with "and the fact that this particular parcel happens to be described in fractional terms [north one-half of lot 9] doesn't diminish it as a unit of real property." This statement was not an acknowledgment by the court that common ownership dictated a "lot," but merely that a fractional piece of property was a unit of property.

Thus, we reject the Village's position that the north one-half and the south one-half of lot 9 became one lot because the Tierneys owned

and used both halves. Each half was a separate lot of record, and the sale of the property to plaintiffs did not violate sections 300(3) and 300(5) because the parcel of land was already divided into two lots prior to the sale to plaintiffs and prior to the enactment of sections 300(3) and 300(5).

The two halves came under section 104(2) because the lots were of record before 1961. They were part of a subdivision recorded in the office of the county recorder, and the deeds which showed the halves as separate parcels or lots were recorded in the office of the recorder of deeds. We find this sufficient to make the north one-half of lot 9 a lot of record under the 1974 ordinance. As previously stated, it did not merge with the south one-half of lot 9, and, thus, its sale did not violate sections 300(3) and 300(5).

The Village argues that under section 104(2) the exception for undersized lots only applies to lots in single ownership because the provision only exempts lots where the adjoining lots on both sides are improved or there is insufficient land adjacent thereto to provide the required width or area. Plaintiffs' property is situated between two improved parcels and comes within this exception. While the Village claims that all of lot 9 was a conforming parcel due to common ownership by the Tierneys, we have rejected this argument. Common ownership did not merge these halves into one. They remained separate lots which came under section 104(2). When the Tierneys owned the north half of lot 9, it was also situated between two improved lots and thus came under section 104(2). The common ownership and usage by the Tierneys, if we assume that the evidence established such usage, did not merge part of the north one-half of lot 9 to the south one-half of lot 9 because the zoning ordinance did not specifically require this result.

■ In the next issue the Village points to the trial court's findings, paragraphs Nos. 4 and 5, and again argues that these findings ignore section 300(5), which does not permit division of an improved lot into nonconforming lots. This argument assumes that both halves of lot 9 became one lot due to common ownership which has been addressed. The north and south halves of lot 9 were separate parcels, and the sale of the north one-half did not cause the south one-half to violate section 300(5). They were already divided parcels.

The Village claims that, when the findings of the trial court are read together, they show the trial court used ownership as shown in the recorder of deeds to determine that the north one-half of lot 9 was an area of land constituting "any lot" for the purpose of section 104(2) but then failed to use ownership to determine a lot for sections

300(3) and 300(5). We do not believe this to be the import of the court's reasoning. It was merely determining that lot 9 became subdivided prior to the zoning ordinance due to the deeds which conveyed the north and south halves separately and became a lot of record. While the conveyances may have originally gone to different owners, both halves, as separate parcels, were eventually conveyed to the Tierneys at different times but remained separate, previously divided parcels. The court was examining the division of the parcel known as lot 9 and not the ownership of lot 9. In other words, if separate deeds for each half went to the same owner in 1925, a division of lot 9 would have occurred prior to the 1974 ordinance and would have made the north one-half of lot 9 a lot of record. The trial court did not apply an inconsistent interpretation to the word "lot."

Next, the Village takes issue with the trial court's finding which provided that "[i]f it [the issue] were material" the evidence failed to establish that the subject property and the south one-half of lot 9 were designated to be used, developed, or built upon as a single tract of land under common ownership or control by the Tierneys. The trial court had already determined that common ownership and usage were not part of the 1974 ordinance, and therefore the evidence on that issue was not material. The Village argues that the manifest weight of the evidence showed that the Tierneys used all of lot 9 as one parcel as evidenced by accessory uses of gardens, driveways, etc. In view of our holding that common ownership and usage did not merge the north and south halves into one lot, we need not address whether the court's finding was against the manifest weight of the evidence. Regardless of what this evidence proved, usage is not relevant to the issue.

■ The Village contends that the trial court improperly shifted the burden of proof to the Village. When a party seeks to avoid the general application of an ordinance and seeks to establish his case as within an exception thereto, it is incumbent upon him to prove those facts which would bring him within the defined exception. (*City of Chicago v. Westphalen* (1968), 95 Ill. App. 2d 331.) It argues that under *O'Laughlin* (65 Ill. 2d 183), the exception for undersized lots is not available to lots which are part of a conforming tract devoted to a common use. Therefore, in order for plaintiffs to come under section 104(2) it was their burden to prove that they were not part of a conforming tract.

■ We agree that plaintiffs had the burden of proving that they came within section 104(2). (*County of Lake v. Zenko* (1988), 174 Ill. App. 3d 54.) They were required to do this by the trial court, and

they submitted evidence to prove that they came under section 104(2). By so doing they also showed that lot 9 had been divided prior to the time that sections 300(3) and 300(5) were applicable, and, thus, no illegal division occurred under those sections.

It was the Village's legal interpretation of the 1974 ordinance that common ownership and usage made both halves of lot 9 one lot which could not be subsequently divided. We have already distinguished *O'Laughlin* on the fact that the City of Chicago had a specific definition for a zoning lot which made lots in common ownership and usage one zoning lot. This provision was not found in the 1974 ordinance. It was not improper for the trial court to require the Village to prove why the exception did not apply once the plaintiffs established that it did.

In the next issue, the Village argues that the trial court should have applied the 1989 zoning ordinance to the property in question. Prior to the trial the Village adopted a comprehensive amendment to its zoning code on May 8, 1989, known as Ordinance No. 3617—Z. Section 104(2) was not reenacted although a different grandfather provision was; a new definition for the term "zoning lot" was added which referred to common ownership of a single tract of land; sections 300(3) and 300(5) were reenacted. The Village asserts that under *Pioneer Trust & Savings Bank v. County of Cook* (1978), 71 Ill. 2d 510, the Village was not estopped from applying the 1989 ordinance and that plaintiffs did not reasonably rely on the Village issuing a permit. *Vaughn v. Speaker* (1988), 126 Ill. 2d 150.

As a general rule, a legislative body has a continuing right to amend a statute or ordinance, even while litigation is pending involving the legislation. (*Sagittarius, Inc. v. Village of Arlington Heights* (1980), 90 Ill. App. 3d 401.) There is no vested right in the continuation of a zoning ordinance. (*Citizens Bank & Trust Co. v. City of Park Ridge* (1972), 5 Ill. App. 3d 77.) However, where there has been a substantial change of position, expenditures or incurrence of obligations made in good faith by an innocent party upon the probability of the issuance of a building permit, a party has a vested property right and may complete the construction and use the premises irrespective of subsequent zoning or zoning classification changes. (*Pioneer Trust & Savings Bank*, 71 Ill. 2d at 522.) For estoppel to apply there must be a reasonable reliance that a building permit would issue. See *Vaughn*, 126 Ill. 2d at 162-63.

The Village again contends that plaintiffs' proposed use of the property was not a permitted one under the 1974 ordinance; however, we have already determined that it was. Nor do we find that plaintiffs

had only a "colorable argument" (see *Sagittarius, Inc.*, 90 Ill. App. 3d at 406) that the grandfather clause applied to their property.

In examining the evidence, James Constantine spoke with Hansen, the Village building and zoning official on two occasions before purchasing the lot. Hansen told him that the lot was buildable because surely it was recorded prior to 1961. Constantine learned from a title-tract search that the property was a separate lot before 1961 and, as we have stated, was a lot of record prior to 1961. Although Hansen denied these conversations, the trial court found that the facts did not support the Village's position that plaintiffs had knowledge of the Village's opinion that the lot was not buildable. The trier of fact determines the credibility of the witnesses and the weight of their testimony. (*MBL (USA) Corp. v. Diekman* (1983), 112 Ill. App. 3d 229.) Hansen also told Carol Constantine that he would issue a permit for the lot. We find that plaintiffs reasonably relied on these statements that the lot was buildable. (See generally *Lipski*, 57 Ill. App. 3d 491; *Mitchell*, 125 Ill. App. 2d 1.) While the Village points out that the Constantines only read the grandfather section of the 1974 ordinance and failed to read the entire ordinance, a buyer who purchases without inquiry or knowledge of a zoning restriction is not precluded from challenging its validity. (See *Citizens Bank & Trust Co.*, 5 Ill. App. 3d 77.) In any event, this court has found that the other sections of the 1974 ordinance did not render the property nonbuildable.

The Village notes testimony which it claims establishes that plaintiffs were aware as early as March 1986 that the Village would not issue a permit. The overall evidence on this issue showed that after plaintiffs purchased the property, Hansen told James Constantine that he was looking forward to reviewing the plans. The Village informed plaintiffs in March 1986 that it was reviewing the property to determine if the property was buildable. There was also evidence that neighbors of the property had petitioned the Village regarding the buildability of the lot in about March 1986. Plaintiffs were aware of this problem with the neighbors. The Village provided an opinion on the buildability of the property *to the neighbors* sometime before February 3, 1987. While Carol Constantine stated in a deposition that they were told in March 1986 the lot was not buildable, the source of that information was not identified. Plaintiffs testified that the Village never informed them that the lot was not buildable until they applied for the permit.

The Village argues that it consistently applied its interpretation of the 1974 zoning ordinance to other properties in the Village. However, we note that the Village did nothing to apprise plaintiffs of this

interpretation before plaintiffs purchased the property or for several months after they bought the property. In fact, the Village, through its zoning official, indicated the property was buildable. Apparently after problems arose with the neighbors, the Village decided to look at the buildability of the lot and yet did not notify plaintiffs that the lot was not buildable until February 1987. The fact that plaintiffs were aware that there was a problem with the neighbors and a question was raised by them with respect to the property does not establish that plaintiffs could not reasonably rely upon the Village's 1974 ordinance, its earlier statements about the property and that the Village would apply the ordinance properly. Plaintiffs believed that problems would be resolved and that they would receive a permit as provided in the ordinance. The Village's conduct could reasonably lead plaintiffs to believe that the permit would be issued since the Village did not apprise them that it would not issue a permit despite the lapse of several months. A further indication of the Village's conduct showed that it did not inform the Downeys of a problem with their property until November 1987. The evidence established that plaintiffs as innocent parties had substantial expenditures and a change in position made in good faith upon the reasonable probability of a building permit being issued. They had a vested right under the 1974 ordinance.

The Village makes a point concerning the writ of *mandamus* which it argued before the trial court. It argues that before a writ of *mandamus* will issue plaintiffs are required to show compliance with all valid requirements of the zoning ordinance. Plaintiffs must have shown a clear and undoubted right to issuance of the writ. (*Solomon v. City of Evanston* (1975), 29 Ill. App. 3d 782.) The Village claims that the trial court did not find that plaintiffs met the other requirements of the code and yet ordered *mandamus* upon the Village's approval of the plans.

The method used by the trial court in fashioning its order is supported by *Clark Oil & Refining Corp. v. Village of Tinley Park* (1969), 110 Ill. App. 2d 61. Similar to the situation in *Clark Oil*, the Village denied the permit due to the zoning problem raised on appeal and never reviewed plaintiffs' plans for compliance with other code provisions. The trial court correctly conditioned the writ upon the Village's approval of the plans after the court determined that the lot was buildable.

Lastly, the Village argues that the trial court improperly denied Steinbrecher's testimony because it was testimony of an observed fact and not opinion testimony of an expert. However, we need not ad-

dress this issue which ultimately goes toward establishing the fact that the oak tree would have to be removed in order to move the driveway to the Downey property. We have determined that common ownership and usage of the property by the Tierneys did not cause the two properties to merge into one lot. Therefore, the position of the tree is not relevant to a determination of the buildability of plaintiffs' property.

The judgment of the circuit court is affirmed.

Affirmed.

REINHARD, P.J., and DUNN, J., concur.